PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

v.

LARRY LAMONT BUSH,
　　　　　*Defendant-Appellant.*

No. 03-4552

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-01-611)

Argued: February 4, 2005

Decided: April 13, 2005

Before WILKINSON and WILLIAMS, Circuit Judges, and
Henry F. FLOYD, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Wilkinson and Judge Floyd joined.

## COUNSEL

**ARGUED:** Caroline D. Ciraolo, ROSENBERG, MARTIN, FUNK &
GREENBERG, L.L.P., Baltimore, Maryland, for Appellant. Robert
Reeves Harding, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.
**ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Joyce K.

McDonald, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

WILLIAMS, Circuit Judge:

Larry Lamont Bush challenges his conviction and sentence for various crimes of identity theft. Bush asserts on appeal that the district court erred by denying his motion for self-representation, his motion to dismiss the indictment for a violation of the Speedy Trial Act, and his motion to suppress evidence obtained in a search of his home. We conclude that Bush's challenges to his conviction are without merit, and, accordingly, affirm his conviction and sentence.

I.

The investigation leading to Bush's prosecution began in September of 1998. On September 15, 1998, Detective Ellsworth Jones, an officer with the Howard County, Maryland, Police Department, received a telephone call from a Ms. Brenda Moon, who believed someone was attempting to obtain a loan in her name from Norwest Financial Bank in Maryland. Jones met with bank employees, who informed him that a woman had indeed called the bank representing herself to be Brenda Moon. The bank employees also told Jones that, during the phone call, a man could be heard in the background, instructing "Ms. Moon." Jones and some fellow officers began surveillance at Norwest Financial, and when "Ms. Moon" called later that day to check on the status of her loan application, she was instructed to come in as soon as possible to complete the application process.

An hour after the phone call from "Ms. Moon," a man and a woman appeared together at Norwest Financial. They arrived in a Jeep Grand Cherokee driven by a man. Upon entering the bank, the woman identified herself as "Ms. Moon" and was led away to complete the loan process. The man, who identified himself as Larry Bush, remained in the lobby while "Ms. Moon" completed her loan

process. After "Ms. Moon" and Bush exited the bank, Jones followed them to the Jeep. "Ms. Moon" opened the passenger door to the Jeep, hiked up her skirt as if she was about to enter the Jeep, and placed her purse on the floor of the passenger side of the car. Before she entered the Jeep, however, Jones placed her under arrest. The woman identified herself as Yvette Canty. Jones and another officer then detained Bush because, given the bank employee's statement that a male voice was heard during the phone conversations, Jones concluded that he "had good reason to believe that at that point that he was probably involved." (J.A. at 189.)

Jones then conducted a search of the vehicle. The search revealed information regarding the fraudulent loan, including a computer print-out of a credit report for Brenda Moon as well as a sheet of paper containing handwritten information about Brenda Moon. Jones also discovered a phone bill in Bush's name that listed an address of 122 North Wolfe Street in Baltimore. Jones then placed Bush under arrest.

Following her arrest, Canty waived her *Miranda* rights and provided the following written statement to Jones:

> I Yvette went in the loan office and signature for a loan that was not mine. I was ask [sic] to do this because of problems I have [sic] money and drugs. All the paper that I need [sic] to use was give to [sic] me by Larry Bush. All information too. I would had been pay [sic] for this if it happen.

(J.A. at 67.)

Canty also gave several oral statements to Jones, indicating that Bush lived at the North Wolfe Street address, and that Bush had a computer at that address that contained all of the information on the fraudulent loan.

Jones obtained a search warrant for Bush's 122 North Wolfe Street residence. In the course of executing the warrant, Jones seized two computers which produced evidence against Bush. Based on that evidence, Bush was prosecuted in Maryland state court for bank fraud.[1]

---

[1]The record is somewhat unclear as to what happened in the Maryland proceedings. Apparently Bush was convicted, but he was granted a new

After Bush's initial conviction was reversed on appeal, Bush was scheduled to be retried on state law charges in 2001. Jones, who expected to testify at the second trial, began to reacquaint himself with the case. In the course of familiarizing himself with Bush, he ran a motor vehicle report in March 2001. The motor vehicle report revealed that Bush had a 2000 BMW sport-utility vehicle titled in his name. Because of Jones's prior experience with Bush's fraudulent activities, Jones decided to investigate further.

Jones's investigation established that the 2000 BMW was originally titled in the name of Robert Bogle, a recently-deceased resident of New Jersey. Suspicion aroused, Jones made several inquiries and discovered that Bush had a fake New Jersey's driver's license made with his picture and Bogle's personal information. Upon receiving this information, Jones contacted the Federal Bureau of Investigation for assistance. Eventually, Jones and the agents discovered that Bush had, on several occasions, used fake driver's licenses to obtain online loans for purchasing luxury cars. These driver's licenses contained the personal information of recently-deceased individuals and Bush's photograph. After obtaining the loan and purchasing the car, Bush would then create fake lien release papers and resell the cars for cash. Upon discovering this information, Jones then executed another search warrant at the North Wolfe Street address on June 8, 2001. This search revealed, among other physical evidence, software formats used to create the fake driver's licenses, personal information of the individuals whose identities Bush stole, and the fake lien-release papers.

Shortly thereafter, on January 2, 2002, Bush was indicted by the federal grand jury for the District of Maryland. The superseding indictment charged Bush with fifty-six counts. Count One of the indictment alleged that Bush used a false identity to defraud Arkansas

trial because he was not informed of his right to a jury trial. Bush then pleaded guilty before the second trial and was sentenced in 2001 to fifteen years imprisonment, which was suspended to eight years. Bush had also been arrested on a credit card fraud scheme by Maryland state authorities. Bush was, at the time of the federal prosecution at issue in this case, incarcerated in Maryland state prison.

National Bank in 1998 in violation of 18 U.S.C.A. §§ 1342, 1344 (West 2000). Count Two alleged that Bush used a fake Social Security Number to obtain a car loan in violation of 42 U.S.C.A. § 408(a)(7)(B) (West 2003). Counts Three through Six alleged that Bush committed identity theft to procure loans from banking institutions to finance his luxury car scheme in violation of 18 U.S.C.A. §§ 1342-44 (West 2000 & Supp. 2004). The remaining counts, Counts Seven to Fifty-Six, related to Bush's decision to adopt his step-mother's identity for the purpose of obtaining her Social Security payment in violation of 18 U.S.C.A. § 2 (West 2000) and 18 U.S.C.A. § 510(a)(2) (West 2000). Bush's step-mother passed away in May 1997. Bush obtained a death certificate for his step-mother, but he did not inform the Social Security Administration of her passing. Instead, Bush or an accomplice forged his step-mother's signature and Bush continued depositing the checks into a joint checking account he held with his step-mother.

Bush made his initial appearance in the district court on January 11, 2002, with appointed counsel, Franklin Draper. On February 8, Draper, at the Government's suggestion, filed a motion to sever counts in the superseding indictment so that plea negotiations could commence. The Government responded to this motion on October 2, 2002. At that time, the Government believed that Bush had agreed to enter into a plea bargain. Bush, however, refused to sign the plea bargain, and on October 7, 2002, Bush filed a motion to appoint new counsel, which was granted following a hearing on October 21, 2002. Bush also filed a *pro se* motion to suppress certain evidence obtained from his home at 122 North Wolfe Street. On January 3, 2003, the district court denied the motion to suppress. At the close of that hearing, the district court also denied the motion to sever.

On January 22, 2003, Bush filed a *pro se* motion to dismiss the indictment for a violation of the Speedy Trial Act. Although the clerk received this motion on that date, instead of officially docketing the motion, the clerk forwarded the motion to the district judge's chambers. The motion was properly docketed during a hearing on March 4, 2003, and the district court affirmed that the motion had been received in January. This motion was denied.

On February 19, 2003, a week before trial was set to begin, Bush filed a *pro se* motion for new counsel or for the right to proceed *pro*

*se*. The district court addressed that motion in a lengthy hearing on the morning of the first day of trial, February 24, 2003, and ultimately denied Bush's request to proceed *pro se*. The basis for Bush's motion was that his counsel failed to communicate with him. Bush's counsel responded that the failure to communicate lay with Bush, and, "it is my view that Mr. Bush has decided, for whatever reason, to make me the issue [in this case]." (J.A. at 235.) Bush explained his position stating, "I would rather be my own sacrificial pig and just go before the court on my own, by going *pro se*. I have that right, and I want to exercise it." (J.A. at 238.)

The district court recognized, "the circumstances under which [the court] could actually refuse to permit [Bush] to represent [him]self are very, very narrow," and "it's not at all clear . . . that those circumstances [we]re presented in this case." (J.A. at 241.) The district court explained the virtues of being represented by counsel and admonished Bush, "you are saying to me you are willing to sit there and try to keep up with all of this, when I know full well that you can't." (J.A. at 248.) Nonetheless, the district court again mentioned, "I am probably going to have to allow it." (J.A. at 248.) The district court asked Bush whether he was familiar with federal practice and procedure. Bush responded that he had been indicted twice by a federal grand jury. Bush again urged, "I prefer to put my own defense on . . . if you are not going to give me another counsel, I will represent myself." (J.A. at 254.)

The district court asked Bush if he was prepared to go to trial, and Bush responded "[n]o. But you said you are not going to honor a continuance, so I have no other choice." (J.A. at 254.) The district court then reversed its earlier inclination and said, "I think then I have the prerogative under those circumstances not to permit you to represent yourself . . . where you just admitted to the Court that you are not ready for trial." (J.A. at 255.) Bush then responded that he could put on a better defense than his counsel, and that if counsel remained, he would absent himself from the proceedings.

Before turning to other issues, the Government asked the district court to create a formal record, as we suggested in *United States v. Singleton*, 107 F.3d 1091 (4th Cir. 1997). The district court obliged and entered into a colloquy with Bush. During the exchange, Bush

revealed that he had been previously diagnosed with manic depression, and that he was currently on Prozac to combat depression. After some prodding, Bush also revealed that he had attempted suicide as a juvenile and as an adult.

At the close of the colloquy, the district court denied the motion and made the following findings:

> I find that you are not capable of representing yourself. By your own admission, you have not reviewed the discovery. Although you have dropped a few legal terms and you clearly have done some reading on the law, you are no more prepared to represent yourself in this trial than that easel sitting over there, with all respect.
>
> While you were jealously guarded of disclosing your psychiatric history, and I understand why and I respect that, it is reasonably clear to this Court that you are not capable of making a rational, intelligent, competent, knowing decision to discharge [counsel].
>
> . . .
>
> I referred to you as manipulative earlier, and I think you are manipulative, but, given your psychiatric history . . . it may well be that you are not, shall we say, purposely manipulative.

(J.A. at 299-300.)

The district court viewed Bush as manipulative, stating, "I find that you are misrepresenting the nature of your relationship [with counsel]." (J.A. at 300.) Later, the district court referred to Bush as a "control freak." (J.A. at 303.) The next day, Bush moved for the district court to reconsider its earlier ruling. The district court declined to do so, explaining, "[i]t is clear to this Court that Mr. Bush, indeed, does not have a genuine and sincere wish to represent himself. To the contrary, what Mr. Bush wants is for the Court to make a third appointment of counsel." (J.A. at 347.) Continuing, the district court stated,

"Bush obviously wants . . . primarily, number one, a further postpone-
ment of the trial of this case, and, second, a third lawyer, someone he
can control, someone who will do exactly what he says . . . ." (J.A.
at 347.) The district court concluded by noting, "[h]e wants to make
a mockery of these proceedings. That's what Mr. Bush wants." (J.A.
at 348.)

Following the denial of the motion for self-representation or
appointment of new counsel, Bush requested to absent himself from
the proceedings, contending, "I can do much better representing
myself, and I would rather not be here to watch myself crash and
burn." (J.A. at 360.) Bush also posited, "I will find it very hard to just
sit here and see a lie being put forward and not speak up against it."
(J.A. at 306.) The district court noted that during this proceeding Bush
was "smiling very broadly and grinning and fairly enjoying himself."
(J.A. at 359.) The district court granted Bush's request to absent him-
self, and trial began. On March 4, Bush was convicted on Counts 1-
6 and 14-56 in the indictment. He was acquitted on Counts 7-13. Bush
was sentenced to 105 months imprisonment. He noted a timely *pro
se* appeal, and we have jurisdiction under 28 U.S.C.A. § 1291 (West
1993).

## II.

On appeal, Bush raises several challenges to his conviction.[2] First,
Bush argues that the district court erred in denying his motion for
self-representation. Next, Bush contends that his Speedy Trial Act
rights were violated because of the delay between his indictment and
trial. Finally, Bush asserts that the district court erred in denying his
motion to suppress evidence relevant to Count 1 of the indictment, the
allegation of fraud against Arkansas National Bank.[3] We address each
argument in turn.

---

[2]At oral argument, Bush requested that we remand the case for resen-
tencing in light of *Booker v. United States*, 125 S. Ct. 738 (2005). Bush
subsequently withdrew his request to remand for resentencing.

[3]Bush also contends on appeal that the district court should have
granted him a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154
(1978) to determine whether the 1998 search warrant application for
Bush's 122 North Wolfe Street home contained material false statements.
We have reviewed the briefs and record in this case and do not believe
that the allegedly "false information was essential to the probable cause
determination." *Simmons v. Poe*, 47 F.3d 1370, 1383 (4th Cir. 1995).

III.

Bush's first contention on appeal is that the district court erred in refusing to grant his request for self-representation. We review a district court's denial of a defendant's right to self-representation de novo. *Singleton*, 107 F.3d at 1091 n.3. We review the district court's findings of historical fact for clear error. *United States v. Mackovich*, 209 F.3d 1227, 1236 (10th Cir. 2000).

The Supreme Court first recognized a defendant's right to self-representation at trial in *Faretta v. California*, 422 U.S. 806 (1975). After cataloguing the history of the right, both in England and the American colonies, the Court held that "the defendant . . . must be free personally to decide whether in his particular case counsel is to his advantage," and that "his choice must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* at 834 (internal quotation marks omitted). This right, however, is mutually exclusive of the right to counsel guaranteed by the Sixth Amendment. *United States v. Frazier-El*, 204 F.3d 553, 558 (4th Cir. 2000). In recognition of that fact, the Court explained, "in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits [obtained from the right to counsel]." *Faretta*, 422 U.S. at 835 (internal quotation marks omitted). In addition, "[the defendant] should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (internal quotation marks omitted). The Court made clear that the defendant "need not himself have the skill and experience of a lawyer," but it also cautioned that the "right of self-representation is not a license to abuse the dignity of the courtroom." *Id.* at 835, 834 n. 46. Later cases have clarified that a district court cannot deny a defendant's right to self-representation merely because the defendant lacks "technical legal knowledge." *Godinez v. Morgan*, 509 U.S. 389, 399-400 (1993); *see also United States v. Mack*, 362 F.3d 597, 601 (9th Cir. 2004).

We "review the sufficiency of a waiver of the right to counsel by evaluating the complete profile of the defendant and the circumstances of his decision as known to the trial court at the time," by "examining the record as a whole."[4] *Singleton*, 107 F.3d at 1097. In

---

[4]A district court faced with a request for self-representation should inquire into "the defendant's background capabilities and understanding

determining whether a defendant properly has exercised his right to self-representation and waived his right to counsel, we ascertain whether the assertion of the right to self-representation is (1) clear and unequivocal; (2) knowing, intelligent and voluntary; and (3) timely. *See Frazier-El*, 204 F.3d at 558. The requirement that the assertion be clear and unequivocal "is necessary to protect against an inadvertent waiver of the right to counsel by a defendant's occasional musings," and it also "prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation." *Id.* at 558-59 (internal quotation marks omitted). Additionally, "[i]n ambiguous situations created by a defendant's vacillation or manipulation, we must ascribe a 'constitutional primacy' to the right to counsel." *Id.* "At bottom, the *Faretta* right to self-representation is not absolute, and the 'government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.'" *Id.* (quoting *Martinez v. Court of Appeal*, 528 U.S. 152 (2000)).

The district court denied Bush's request to represent himself because Bush did not clearly and unequivocally assert the right, and because Bush was not capable of making a knowing, intelligent, and voluntary waiver of his right to counsel.[5] The district court erred to the extent it relied on Bush's lack of legal knowledge and history of mental illness in making this ruling. *See Godinez*, 509 U.S. at 399 ("[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence *to waive the right*, not the competence to represent himself.")

We have held, however, that a district court can deny a request for

---

of the dangers and disadvantages of self-representation," but the failure to conduct a formal inquiry is not per se reversible error. *United States v. Singleton*, 107 F.3d 1091, 1098 (4th Cir. 1997).

[5]In its brief, the Government asserts that Bush's request was also untimely. We disagree. In *Singleton* we set the beginning of trial as the relevant date for denying a request as untimely. *See Singleton*, 107 F.3d at 1099 ("And if a defendant first asserts his right to self-representation after trial has begun, the right may have been waived."). Bush's motion in this case was filed about a week before trial, and was therefore timely.

self-representation when the request is made for purposes of manipulation because, in such cases, the request will not be clear and unequivocal. *Frazier-El*, 204 F.3d at 560. "A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel." *Frazier-El*, 204 F.3d at 560. *See also Buhl v. Cooksey*, 233 F.3d 783, 797 (3d Cir. 2000) ("the right of self-representation is not a license to disrupt the criminal calendar, or a trial in progress").

Bush argues that the district court clearly erred in determining that he was manipulative, and that, accordingly, his assertion was clear and unequivocal. We do not believe, on the record as a whole, the district court clearly erred in finding Bush manipulative. Bush's reason for dismissing his first counsel was counsel's refusal to file motions as Bush requested. Bush told the district court that he wanted to represent himself but was not ready for trial. Bush referred to himself as a "sacrificial pig," (J.A. at 238) and appeared in court wearing his orange jumpsuit, even though the Maryland Division of Corrections offered him civilian clothing. Bush's own counsel stated that Bush was attempting to make counsel the issue in the case. Bush decided to absent himself from the proceedings because he would disrupt them if he remained. Even though Bush was represented by counsel, prior to and during the trial he continued to file *pro se* motions. Bush informed the district court that he wanted a forensic expert appointed in the trial, which the district court noted was unnecessary. In fact, Bush stated during the self-representation hearing that "I would have pled guilty to this case a long time ago if I had just been given my day in court on a fair motions hearing. That's all I asked for." (J.A. at 302.)

We believe, on the record before us, the district court was permitted to find that Bush was engaged in an effort to manipulate and distort the trial process. The facts of *Mackovich* present a helpful comparison. In that case, the defendant was held over for two competency hearings, because he believed he was receiving prophecies from God. *Mackovich*, 209 F.3d at 1231. During the oral hearings on his competency, he was "especially noisy" and made "loud and inappropriate comments." *Id.* On the eve of trial, the defendant moved to represent himself because of a "rift" with counsel. *Id.* at 1235. The district court denied the request, and the Tenth Circuit affirmed. The

Tenth Circuit reaffirmed that defendants cannot use the right to self-representation as "a tactic for delay." *Id.* at 1237. In upholding the district court's ruling, the Tenth Circuit found important that the defendant had (1) used counsel for almost seven months; (2) appeared in court with his attorney on multiple occasions; (3) made the request only six days before trial; (4) made the request because counsel failed to file frivolous motions; and (5) threatened to "stand mute" if the request was denied. *Id.*

Likewise, in this case Bush had appeared in court with counsel on several occasions, including the hearing on the motion to suppress. Bush's request, while not per se untimely, was made only a week before trial was scheduled to begin and was based on counsel's refusal to file certain motions. Bush, in fact, continued to file motions during the trial while represented by counsel. Admittedly, Bush did not threaten to "stand mute;" to the contrary, Bush threatened to disrupt the trial if his motion was denied.

In sum, "[e]ven at the trial level, . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Martinez*, 520 U.S. at 162. The district court did not clearly err in finding that Bush's request was an effort to delay and manipulate the trial proceedings, and, accordingly, it did not err in denying Bush's request for self-representation.

## IV.   Speedy Trial Act

Bush next asserts that the delay between his indictment and trial violated the Speedy Trial Act, 18 U.S.C.A. § 3161 (West 2000 & Supp. 2004). "We review de novo a district court's interpretation of the [Speedy Trial Act], while we review any of the court's related factual findings for clear error." *United States v. Leftenant*, 341 F.3d 338, 342 (4th Cir. 2003).

The Speedy Trial Act provides, in relevant part, that "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date . . . of the information or indictment, or from the date the defendant has

appeared before a judicial officer . . . whichever date last occurs." 18 U.S.C.A. § 3161(c)(1) (West Supp. 2004). Bush's initial appearance was on January 11, 2002, but his trial did not commence until February 24, 2003, over a year later.

The Speedy Trial Act, however, provides that some periods of delay are excluded when calculating the seventy-day time period. Section 3161(h)(1)(F) provides that "[t]he following periods of delay shall be excluded . . . in computing the time within which the trial of any such offense must commence: . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C.A. § 3161(h)(1)(F) (West 2000). Section 3161(h)(1)(J) provides that "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court" should also be excluded when calculating time under the Act. 18 U.S.C.A. § 3161(h)(1)(J) (West 2000).

Bush filed a motion on February 8, 2002, to sever several counts in the indictment for trial. Bush's motion also requested a hearing. The Government responded to that motion on October 2, 2002. The motion was denied by the district court at the close of the suppression hearing on January 3, 2003. The Government contends that, under § 3161(h)(1)(F), all of the time from the filing of the motion to sever, on February 8, 2002, until its resolution, on January 3, 2003, should be excluded from the seventy-day time period. With that time excluded, the Government notes, no Speedy Trial Act violation occurred. Bush contends that, because no hearing took place on the motion to sever, § 3161(h)(1)(J) applies and only thirty days can be excluded under the Speedy Trial Act.[6]

Bush is correct that, under *United States v. Henderson*, 476 U.S. 321, 329 (1986), § 3161(h)(1)(J) applies to any motion the district court rules upon that requires no hearing. In *Henderson*, the Court

---

[6]Bush also contends, without citation, that the motion to sever cannot permit any time under the Speedy Trial Act to be excluded because he did not consent to the filing of the motion by defense counsel. This argument lacks merit.

examined § 3161(h)(1)(F) in detail, explaining that "[s]ubsection (F), written in the disjunctive, excludes time in two situations." *Id.* at 329. Relevant here:

> The second situation concerns motions that require no hearing and that result in a 'prompt disposition.' There, the promptness requirement was "intended to provide a point at which time will cease to be excluded, where motions are decided on the papers filed without hearing." S.Rep. No. 96-212, at 34. The "point at which time will cease to be excluded" is identified by subsection (J), which permits an exclusion of 30 days from the time a motion is actually "under advisement" by the court.

*Id.*; *see also United States v. Bermea*, 30 F.3d 1539, 1566 (5th Cir. 1994) ("Once a hearing has been held on a motion and all necessary additional materials submitted to the court, *or once a motion not requiring a hearing is filed along with necessary supporting materials*, § 3161(h)(1)(J) limits the excluded period to thirty days") (emphasis added); *United States v. Davenport*, 935 F.2d 1223 1237 n. 12 (11th Cir. 1991) (same).

Thus, subsection (J) excludes thirty days for motions not requiring a hearing, from the time the motion is filed with all necessary supporting materials. If a hearing is conducted, then § 3161(h)(1)(F) applies and "all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is reasonably necessary" is excluded under the Speedy Trial Act. *Henderson*, 476 U.S. at 330 (1986). Thus, our resolution of this issue hinges upon whether a hearing was required on Bush's motion to sever.

In this case, the following exchange occurred between counsel and the district court on the motion to sever:

> **The Court:** Now, Mr. Gigliotti, do you want to be heard briefly on the motion to sever?
>
> **Mr. Gigliotti:** Your honor, I didn't receive the motion to sever, although I have a huge box. I did read Mr. Harding's response, so I am —

**The Court:** Okay. So, you know what it says. I will reconsider it if you want to have me reconsider it, but I am prepared to deny the motion.

**Mr. Gigliotti:** After I look at it, if I could raise it again, I would appreciate it.

**The Court:** I will allow you to raise it again, but it is clear to me that for the reasons spelled out in the government's opposition, this truly is one scheme.

(J.A. at 225-26.)

Bush contends that this limited exchange was not a "hearing" for purposes of § 3161(h)(1)(F), while the Government contends otherwise.[7] We need not decide this question, however, because we believe that § 3161(h)(1)(F) applies because, when the motion to sever was filed, Bush specifically requested a hearing. The district court, in the above colloquy, was offering that hearing, which Bush's counsel declined. Given the specific request for a hearing by Bush, coupled with the offering of that hearing by the district court, we believe that § 3161(h)(1)(F) applies and permits the exclusion of the time from the filing of the motion on February 2, 2002 until the resolution of the motion on January 3, 2003. A contrary rule would permit defendants to knowingly manipulate the time limitations of the Speedy Trial Act.[8]

---

[7]The Government notes that we have never held what constitutes a "hearing" under the Speedy Trial Act, and points us to decisions from the First and Fifth Circuits, as thoughtful opinions on the topic. *See United States v. Staula*, 80 F.3d 596, 602 (1st Cir. 1996) ("a hearing is any on-the-record colloquy in which the district court hears the arguments of counsel and considers those arguments prior to deciding a pending motion."); *United States v. Grosz*, 76 F.3d 1318, 1325 (5th Cir. 1996), ("[h]earing . . . includes a situation . . . in which the district court hears the argument of, and questions, counsel for the party against whom the ruling on the motion is made.")

[8]We do not suggest such a motive in this case. At the time the hearing was conducted on January 3, 2003, Bush was represented by a different defense counsel from the one who filed the original motion to sever. As the excerpted portion from the hearing makes clear, Bush's new counsel was not familiar with the particulars of the motion to sever.

Defendants would be free to request a hearing, delay the actual holding of that hearing, and then decline the hearing altogether and allege a Speedy Trial Act violation.

In sum, if a defendant requests a hearing, and a hearing is offered and declined, we believe that § 3161(h)(1)(F) applies, and excludes all of the time up until the offer of the hearing is affirmatively declined. After the defendant declines the offer of a hearing, then the motion is under advisement and § 3161(h)(1)(J) applies. Applying that rule here, no Speedy Trial Act violation occurred. The time from February 2, 2002 until Bush's counsel declined the district court's offer to hold a hearing on January 3, 2003, is excluded from the seventy day window. Excluding that time period, fewer than seventy days elapsed between Bush's initial appearance and trial.

## V.   Fourth Amendment Violation

Bush next contends that all of the evidence obtained from his North Wolfe Street residence should have been suppressed as "fruit of the poisonous tree." Specifically, Bush contends that the 1998 search of his Jeep Grand Cherokee by Jones was an unconstitutional warrantless search, and therefore, because the affidavits in support of the search warrants filed in 1998 and 2001 for the 122 North Wolfe Street address included information found in the Jeep, those search warrants must be declared invalid.[9]

We review a district court's factual findings on a suppression motion for clear error and its legal conclusions de novo. *United States v. Brookins*, 345 F.3d 231, 234 (4th Cir. 2003). The Government concedes that a warrantless search occurred in this case when Jones searched Bush's Jeep Grand Cherokee in 1998. It is, of course, a "cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (internal quotation marks omitted). The Govern-

---

[9]Bush contends that this motion to suppress related to evidence used to support Counts One to Six in the indictment. The Government contends that only Count One in the indictment is implicated by the motion to suppress. Because we believe the district court was correct to deny the suppression motion, we need not address this dispute.

ment, however, contends that the exception recognized in *New York v. Belton*, 453 U.S. 454 (1981), applies in this case. The district court agreed with the Government and denied Bush's motion to suppress after ruling that the *Belton* exception applied. We, too, agree with the Government, and we hold that *Belton*, as interpreted in *Thornton v. United States*, 124 S.Ct. 2127 (2004), permitted Jones to search the Jeep Cherokee.

In *Belton*, the Court held that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton*, 453 U.S. at 460. *Belton* did not purport to answer whether such a rule applied in cases where a recent occupant of a car was arrested in the immediate vicinity of the vehicle. This past term, the Supreme Court decided, in *Thornton*, 124 S.Ct. at 2132, that *Belton* permits search of vehicles incident to arrests made outside of the vehicle as long as the arrested individual was a recent occupant of the vehicle.

The Court in *Thornton* justified the extension of *Belton* to recent occupants arrested outside of the vehicle because "the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle." *Thornton*, 124 S.Ct. at 2131. The Court also explained that in "some circumstances it may be safer and more effective for officers to conceal their presence from a suspect until he has left his vehicle." *Id.* Likewise, we believe that, in this case, the arrest of Canty as she prepared to enter the vehicle presented the same concerns of officer safety and destruction of evidence recognized by the Court in *Thornton*. Accordingly, because officers had seen Canty exit the Jeep just before entering the Norwest Financial Bank, and because Canty was in the process of reentering the Jeep at the time of her arrest, Jones was permitted to search the Jeep incident to Canty's arrest. Accordingly, the search warrants executed at 122 North Wolfe Street are not invalid as fruit of the poisonous tree.

## VI.

For the foregoing reasons, Larry Lamont Bush's conviction and sentence are affirmed.

*AFFIRMED*