**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4914**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PERCY JAMES TUCKER,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Arenda Wright Allen, District Judge.  (2:09-cr-00182-AWA-DEM-1)

Submitted:  June 19, 2013            Decided:  August 9, 2013

Before TRAXLER, Chief Judge, and GREGORY and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Maureen Leigh White, Richmond, Virginia, for Appellant.  Neil H. MacBride, United States Attorney, Alexandria, Virginia; Sherrie S. Capotosto, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendant Percy James Tucker filed this appeal challenging his conviction for conspiracy to distribute and possess cocaine and marijuana, money laundering, and other related charges. Tucker argues that the district court erred both when it denied his motion for judgment of acquittal[1] on each of eleven counts and when it denied his motion to proceed pro se. Finding no error, we affirm.

I.

A.

Defendant Percy Tucker has been involved in the trucking business since 1990. In the early 2000s, Tucker set up and managed trucking companies for several individuals, including Jovan Hassell, David Bragg, and Randolph Person. Hassell, Bragg, and Person testified at trial that Tucker knew of their involvement in the drug trade. After Tucker set up these trucking businesses and assisted in the purchase of tractor trailers, he created false liens that allowed the owners to

---

[1] Tucker's appeal is framed as a challenge to the district court's denial of a "directed verdict of acquittal." The Federal Rules of Criminal Procedure state that "[m]otions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place." Fed. R. Crim. P. 29(a). We therefore construe Tucker's appeal as a challenge to the denial of his motions for judgment of acquittal.

2

avoid forfeiture in the event they were arrested for dealing in narcotics. In 2004, Tucker incorporated MidAtlantic Commodities, which leased a warehouse in Virginia Beach where the tractor trailers were loaded and unloaded. Although Hassell and Bragg paid the rent, Tucker's name was on the warehouse lease.

Hassell and Bragg testified that they transported at least ten kilograms of cocaine each week from Atlanta to Virginia from 2001 until 2009. Beginning in approximately 2006, they began to transport cocaine using the trucking companies and warehouse. Typically, Hassell and Bragg hid money inside the spare tires of rented SUVs and then loaded the SUVs into tractor trailers at the warehouse. Hassell explained that they would take the tire from the bottom of the truck, pop it open, stuff money inside, re-seal and re-inflate it, and then place it back underneath the SUV. Once in Atlanta, they would take the money out of the tire and replace it with the cocaine they purchased from their supplier. After returning to the warehouse, buyers would go to the warehouse to purchase cocaine that had been broken down into smaller quantities. One associate, Kimani Lewis, testified that there were money machines, scales, and baggies in the warehouse for breaking the drugs into smaller amounts. Hassell affirmed that on numerous occasions, Tucker was present in the warehouse while drug operations were being conducted. There was no

3

testimony presented at trial, however, establishing that Tucker ever actually saw drugs being handled at the warehouse.

Hassell and Bragg both testified that in 2006, Tucker began to personally transport money and drugs. In one instance, Hassell asked Tucker to drive him to Atlanta to complete a deal. Tucker drove the truck to a Wal-Mart parking lot. Hassell then took the money he had hidden in a suitcase beneath the bed of the tractor trailer and handed it to his supplier. After his supplier took the money out of the suitcase, Hassell placed the cocaine he had purchased into the suitcase and returned the suitcase to its hiding place. Tucker then drove the truck with the drugs back to Virginia. Again, there was no direct evidence presented that Tucker viewed the drugs being placed into the suitcase or onto the truck he was driving. However, Hassell and Bragg also described another drug deal involving the purchase of a large quantity of marijuana from Texas. Testimony at trial indicated that Tucker hid the marijuana inside thrift store furniture, loaded it onto a truck, and then hired someone to drive the truck from Texas to Virginia.

Tucker also supported Hassell and Bragg's drug operation in other ways. In 2003, North Carolina police pulled Bragg over and seized over $49,000 in cash he was carrying to make a cocaine purchase. Bragg testified that he paid Tucker $15,000 to retrieve the money. Tucker called the police officer who

4

made the seizure and told the officer that the money was intended for the purchase of a tractor trailer. Later, Tucker created fake loan documents, which he presented at a forfeiture hearing in a federal court in North Carolina. Ultimately, Tucker received a check for the amount of money that had been seized, which he placed in Bragg's account after claiming his $15,000 payment.

Tucker also helped Person avoid police seizure of proceeds from narcotics sales. Person testified that he used a friend's house in Chesapeake, Virginia to cook powder cocaine into crack cocaine. At one point, he invited Tucker to come to the house to complete a business transaction. While Tucker sat and waited, Person finished cooking a nine-ounce batch of powder cocaine into crack cocaine in plain view of Tucker. About two weeks after Tucker's visit, Person was arrested. After Person was released on bond, he told Bragg and Tucker that the police were going to seize his bank accounts. Tucker hatched a plan to avoid the seizure. Person wrote Tucker a $22,000 check which Tucker cashed at a nearby SunTrust Bank branch. Tucker returned with $9,000 cash and a $13,000 cashier's check. He told Person that the bank did not have the full $22,000 cash on hand and that he would find another way to cash out the remaining money to give to Person. However, Person never received any additional money from Tucker.

5

In 2005, Hassell and Bragg attempted to purchase "Bada Bing" nightclub in Virginia Beach. However, after learning that Hassell and Bragg were felons, the owner refused to sell the club because felons would not be able to obtain a Virginia liquor license. Hassell and Bragg testified that they offered Tucker money to act as the "front man." Tucker agreed and was able to purchase the club in his name and take out a liquor license. To disguise the source of the funds used to make the down payment on the nightclub, Tucker arranged to have a third person, James Hunter, wire Hassell and Bragg's narcotics-derived cash to the MidAtlantic Commodities bank account. Hassell and Bragg paid Tucker to assist in the wire transfer and purchase of Bada Bing nightclub, and to remain as the front man while they operated the business.

B.

Upon his arrest in September 2009, the court appointed attorney John C. Gardener to represent Tucker. In November 2009, Tucker submitted a letter motion to the district court requesting that a new attorney be assigned to him. After Gardener's replacement, David Bouchard, withdrew due to a conflict of interest, the court appointed a third attorney to represent Tucker, Jon M. Babineau.

In May 2011, Tucker pled guilty to conspiracy to commit money laundering. However, in July 2011, two weeks before

6

sentencing, Tucker filed another motion for new counsel and also moved to withdraw his plea. The court granted both motions and set trial for December 2011. Jennifer T. Stanton was appointed as Tucker's fourth attorney.

On October 6, 2011, Tucker filed yet another motion for new counsel. The court held a hearing to consider the motion on October 13, 2011. At the hearing, Tucker expressed his frustration with Ms. Stanton's refusal to file certain motions he urged her to file. The court explained that the motions Tucker sought to file were frivolous, and that Ms. Stanton was under an obligation not to file frivolous motions. Tucker further explained that he wanted to part ways with Ms. Stanton because he did not feel she adequately reviewed his case, and because "females have their method of doing things and I can't change that." Finally, Tucker asked to proceed pro se if the court did not grant his motion for new counsel. After receiving assurances from Ms. Stanton that she was able to continue as Tucker's lawyer, the court denied Tucker's motion for new counsel and directed Ms. Stanton and the Government to brief whether Tucker should be able to proceed pro se.

On November 8, 2011, the court held a hearing on Tucker's motion to proceed pro se. The court asked Tucker a series of questions to gauge his understanding of the charges and applicable sentencing guidelines for each count against him, the

trial process, and the Federal Rules of Evidence and Federal Rules of Criminal Procedure. Tucker's answers showed that he misunderstood the penalties he faced if convicted, had no experience with the trial process and did not understand the Federal Rules of Evidence or Federal Rules of Criminal Procedure. Tucker also explained that if he were to proceed pro se, he would need additional time to prepare for trial. In a written order dated November 14, 2011, the court denied Tucker's motion to proceed pro se.

On December 6, 2011, the day before trial was set to begin, Tucker entered into a second plea agreement. The court deferred acceptance of the plea agreement pending preparation of a presentence report and set sentencing for April 27, 2012. Sentencing was subsequently moved to June 21, 2012, after the court granted Tucker's motion for a continuance. Three days before sentencing, Tucker moved to withdraw his second guilty plea. The court, which had yet to accept and enter the plea, granted the motion to withdraw.

On August 14, 2012, a jury found Tucker guilty on each of the eleven counts remaining in the thirteen-count superseding

indictment.[2] Tucker filed a timely appeal of which we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Tucker argues on appeal that the evidence presented at trial was not sufficient to sustain a conviction on any of the counts charged in the superseding indictment and that the district court therefore erred when it denied his motion for judgment of acquittal.

We review a district court's denial of a motion for judgment of acquittal de novo. United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010). Where there is a challenge to the sufficiency of the evidence, as there is here, we must sustain

---

[2] Two counts in the superseding indictment had been dismissed. Tucker was found guilty of: conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty kilograms or more of marijuana in violation of 21 U.S.C. § 846; conspiracy to launder money in violation of 18 U.S.C. §§ 1956(h); possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; three counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2; possession with intent to distribute approximately thirty pounds of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; possession with intent to distribute between 500 grams and five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; laundering of monetary instruments in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2; and engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2.

9

the jury verdict "if there is substantial evidence, taking the view most favorable to the Government, to support [the conviction]." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quoting United States v. Glasser, 315 U.S. 60, 80 (1942)). In other words, we must not embark on the task of re-weighing the evidence or assessing the credibility of the witnesses. United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007). Instead, we assume that the jury has "resolved any discrepancies in favor of the [G]overnment." Id. Ultimately, we must determine whether "any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).

Tucker's challenge to his drug-related convictions centers on his contention that the prosecution did not carry its burden on the intent or knowledge element of each of the charges.[3]

---

[3] On the charge of conspiracy to distribute and possess with intent to distribute cocaine and marijuana, the Government carried the burden to prove that: "(1) an agreement to distribute and possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008). On charges of possession with intent to distribute, the Government carried the burden to prove: (1) possession of the [narcotic]; (2) knowledge of this possession; and (3) intention to distribute the [narcotic]. See Burgos, 94 F.3d at 873. Possession may be actual or constructive. United States v. Rusher, 966 F.2d 868, 878 (4th Cir. 1992). On charges of interstate travel in aid of racketeering, the Government carried the burden to prove:
(Continued)

10

Specifically, he argues there was no evidence establishing that he was aware that the trucking businesses he formed and subsequently managed were being used to run drugs. For instance, Tucker points out that when Hassell asked him to drive to Atlanta to exchange money for drugs, Hassell only stated that he was going to get "some things." Further, while Hassell and others testified at trial that Tucker was occasionally present at the warehouse when drugs were being handled and hid, there was no direct evidence that Tucker actually saw the drugs.

Tucker seeks to cherry pick from the evidence in an effort to concoct a viable argument on appeal. The cumulative evidence against him is not just sufficient, it is overwhelming. Several of the Government's witnesses testified that Tucker was aware of their long-term involvement in drug trafficking, and that he set up a variety of businesses to assist in their criminal operations. The evidence also showed that Tucker took a direct role in Hassell and Bragg's illicit enterprise. Testimony from Hassell and Bragg established that Tucker coordinated the transport of large quantities of marijuana from Texas to the

---

(1) travel between states; (2) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; and (3) performance or attempt to perform the unlawful acts thereafter. 18 U.S.C. § 1952(a); see also United States v. Hayes, 775 F.2d 1279, 1282 (4th Cir. 1985).

11

warehouse Tucker leased in Virginia under the name of MidAtlantic Commodities. And, on more than one occasion, Tucker himself drove large quantities of cocaine from Atlanta to the warehouse in Virginia.

Tucker also found other creative ways to support his co-conspirators. Just weeks after watching Person cook large quantities of powder cocaine into crack cocaine, Tucker helped Person hide money before police could seize his accounts. On another occasion, Tucker fabricated documents and lied under oath to secure the return of nearly $50,000 that had been seized by North Carolina police when Bragg was en route to make a drug purchase.

Cumulatively, this evidence is more than sufficient to substantiate Tucker's knowledge that he was intricately involved in drug trafficking activities as charged. While there may not be direct evidence that Tucker actually watched Hassell put cocaine into the trailer of the truck he was driving, or that he had explicit conversations with co-conspirators about how they could use the various companies to hide their drug-related operations, the jury had sufficient evidence to connect the dots. It is well established that circumstantial evidence, not just direct evidence, must be considered when assessing sufficiency of the evidence. United States v. Grow, 394 F.2d 182, 201 (4th Cir. 1968). Indeed, "circumstantial evidence is

12

treated no differently than direct evidence," and may itself be sufficient to support the jury's verdict. United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989). It is clear here that the combination of direct and circumstantial evidence is such that a reasonable juror could have concluded that Tucker was aware of his involvement in drug trafficking and was guilty of the drug-related crimes as charged.

Tucker next argues that the Government presented insufficient evidence to sustain a conviction of conspiracy to launder money. The Government carried the burden to prove beyond a reasonable doubt that: (1) a conspiracy to commit money laundering was in existence; (2) during the conspiracy, the defendant knew that the proceeds to be concealed had been derived from an illegal activity, and (3) the defendant knowingly joined in the conspiracy. See United States v. Alerre, 430 F.3d 681, 693-94 (4th Cir. 2005) (stating the burden of proof for conspiracy related to promotion money laundering); United States v. Wemmering, 232 F. App'x 372, 374-75 (4th Cir. 2007) (unpublished) (equating the conspiracy standard for promotion money laundering with concealment money laundering).

We find there was sufficient basis for the jury's final determination that Tucker had conspired to launder money. As illustrated above, there was extensive testimony from Hassell, Bragg, Person, and several other co-conspirators evidencing an

13

expansive collaborative drug operation. The group relied on Tucker as a "front man" who could: assist in setting up businesses that appeared legitimate, spend drug proceeds on legitimate purchases, and reclaim or hide cash that had been or might be seized by the police. As noted above, multiple witnesses testified at trial that Tucker was well aware of their involvement in the narcotics trade and that he knew that his assistance would help them in carrying out their illicit activities. The evidence presented at trial was sufficient to support the jury's verdict.

Finally, Tucker argues that no evidence was presented that he had the requisite knowledge to substantiate a guilty verdict on charges related to the purchase of Bada Bing nightclub.[4]

---

[4] These charges include laundering of monetary instruments in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2, and engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2. On the laundering of monetary instruments charges, the Government carried the burden to prove that the defendant: (1) knew the property involved in a financial transaction represented proceeds from an unlawful activity; (2) conducted or attempted to conduct a financial transaction involving such proceeds; (3) with the intent to promote the carrying on of the specified unlawful activity or knowing that the transaction was at least in part designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds. 18 U.S.C. § 1956(a)(1); United States v. Alford, 999 F.2d 818, 823 (5th Cir. 1993). On the charge of engaging in a monetary transaction in property derived from a specified unlawful activity, the Government carried the burden to prove that the defendant "knowingly engage[d] . . . in a monetary transaction in criminally derived property of a value greater than $10,000 (Continued)

14

Extensive testimony was presented at trial, however, establishing that Tucker agreed to act as the front man so that Hassell and Bragg could purchase the business and obtain a liquor license. Further, multiple witnesses testified to Tucker's coordination of a wire transfer of at least $100,000 of Hassell and Bragg's narcotics-derived cash to the MidAtlantic Commodities bank account. Likewise, there is testimony that the wire transfer was designed to conceal the source of the funds and to make it appear that the money used for the down payment on Bada Bing nightclub came from profit earned at MidAtlantic Commodities. The cumulative evidence presented provides sufficient basis for the conclusion that Tucker was well aware of his involvement in a drug-related scheme. The jury's verdict was adequately supported.

III.

Tucker next argues that the district court erred when it denied his request to proceed at trial pro se. We review a district court's legal rulings on pro se representation de novo,

_____

and [was] derived from specified unlawful activity" such as narcotics distribution. 18 U.S.C. § 1957; see United States v. Mansoori, 480 F.3d 514 (7th Cir. 2007) (applying 18 U.S.C. § 1957 to narcotics distribution proceeds).

15

and all findings of fact related to its ruling for clear error. United States v. Bush, 404 F.3d 263, 270 (4th Cir. 2005).

The U.S. Supreme Court has stated that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." Faretta v. California, 422 U.S. 806, 817 (1975). While a defendant's decision must be knowing and intelligent, his technical legal knowledge is "not relevant to an assessment of his knowing exercise of the right to defend himself." Id. at 836. The right to self-representation is not absolute, however. "The government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." United States v. Bernard, 708 F.3d 583, 588 (4th Cir. 2013) (internal quotations omitted). As such, a defendant's assertion of his right to self-representation must be: "(1) clear and unequivocal, (2) knowing, intelligent and voluntary; and (3) timely." United States v. Frazier-El, 204 F.3d 553, 558 (4th Cir. 2000) (internal citations omitted). A court may determine that an assertion of the right to self-representation is not clear and unequivocal where the defendant's actions suggest a desire to delay or manipulate the system more than a desire to self-represent. Id. at 560.

16

Here, the district court held that Tucker had not asserted his right to counsel in a clear and unequivocal manner. The court's holding was based on a factual finding that Tucker's true motivation for proceeding pro se was to manipulate the system and drag out an already long trial process while he remained free on bond. Considering the record as a whole, as we must, see United States v. Singleton, 107 F.3d 1091, 1097 (4th Cir. 1997), we cannot conclude that the district court clearly erred in arriving at its holding.

Tucker's first motion to proceed pro se came alongside a motion for new counsel. In fact, Tucker was on his fourth attorney when he made the motion. He made clear during the hearing that he sought new counsel, or in the alternative to proceed pro se, because present counsel refused to file numerous frivolous motions. A court is not required to grant a motion for self-representation where the defendant's motivation is to file frivolous motions that appointed counsel would not file. Frazier-El, 204 F.3d at 560; United States v. Mackovich, 209 F.3d 1227, 1237 (10th Cir. 2000). Given that Tucker had in fact sought to file frivolous pro se motions, the district court did not clearly err in making the findings that form the basis of its conclusion here.

The district court also made a factual finding that Tucker sought to delay his trial by proceeding pro se. A defendant is

17

not permitted to use the right to self-representation as a "tactic for delay." Bush, 404 F.3d at 272 (citing Mackovich, 209 F.3d at 1237. By repeatedly changing counsel and withdrawing his first plea agreement just before sentencing, Tucker had already extended his time on bond over two years. During the hearing on his motion, he informed the court that he would need even more time to prepare his defense if his motion were granted. Given the procedural trajectory of the trial and the repeated delays, we cannot find that the district court clearly erred in holding that Tucker sought to proceed pro se for the purpose of delaying his trial and remaining free on bond.[5]

IV.

For the reasons stated above, we affirm Tucker's convictions. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials

---

[5] The court made additional factual findings pertaining to Tucker's understanding of the law and judicial process. To the extent that the court sought to gauge whether Tucker had sufficient technical legal knowledge to exercise his right to self-representation, it was legal error. See Faretta, 422 U.S. at 836. However, we need not reach this issue because the factual findings related to Tucker's attempt at manipulating and delaying the judicial process are independently sufficient to affirm the district court's denial of his motion to proceed pro se.

18

before the Court and argument would not aid the decisional process.

AFFIRMED