IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 29, 2023 Session

## STATE OF TENNESSEE v. HUBERT GLENN SEXTON, JR.

**Appeal from the Criminal Court for Scott County**
**No. 7685      William B. Acree, Senior Judge**

_____

**No. E2022-00884-CCA-R3-CD**

_____

In 2000, the Scott County Grand Jury indicted the Defendant, Hubert Glenn Sexton, Jr., for two counts of first degree premeditated murder, and the Defendant was convicted of both counts and was sentenced to death for each offense. State v. Sexton, 368 S.W.3d 371, 378 (Tenn. 2012). Thereafter, this court granted the Defendant post-conviction relief from these convictions and remanded his case for a new trial. Sexton v. State, No. E2018-01864-CCA-R3-PC, 2019 WL 6320518, at *26 (Tenn. Crim. App. Nov. 25, 2019). On retrial, the Defendant was again convicted of two counts of first degree premeditated murder and was sentenced to consecutive sentences of life without parole. In this appeal, the Defendant argues the trial court erred (1) by denying his constitutional right to self-representation under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee State Constitution, and (2) by allowing several witnesses to testify about allegations that the Defendant had sexually abused his step-daughter prior to the killings in this case. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

James N. Hargis, Sparta, Tennessee, for the appellant, Hubert Glenn Sexton, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Jared R. Effler, District Attorney General; and Thomas E. Barclay and Apryl Bradshaw, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In May 2000, the Scott County Grand Jury indicted the Defendant for two counts of first degree premeditated murder. At trial, the Defendant was convicted of both counts, and the jury imposed the death penalty for each of the two murder convictions. Sexton, 368 S.W.3d at 383-84. After this court affirmed the Defendant's convictions and sentences, the Defendant appealed to the Tennessee Supreme Court, which affirmed the Defendant's convictions but reversed the death sentences and remanded the case for a new sentencing hearing. Id. at 431. The Tennessee Supreme Court affirmed the Defendant's convictions because the evidence of his guilt was overwhelming but set aside the death sentences because there was an improper striking of prospective jurors based solely on their written responses to the jury questionnaire; because the trial court's admission of hearsay testimony by Hope Tharp, a child protective services worker, about the Defendant's step-daughter's allegations of sexual abuse by the Defendant was prejudicial error because Tharp's testimony was cumulative on the issue of motive; because the trial court erred when it allowed a police officer to testify that the Defendant had refused to take a polygraph examination; and because the prosecution made improper comments during opening and closing arguments. Id. at 400-431. Prior to the Defendant's re-sentencing hearing, the State withdrew its intent to seek the death penalty, and the Defendant received consecutive life sentences. Sexton, 2019 WL 6320518, at *6.

After being resentenced, the Defendant timely filed a petition for post-conviction relief. Id. After the post-conviction court denied relief, the Defendant appealed to this court, alleging that the post-conviction court failed to make specific findings of fact regarding several issues addressed at the post-conviction hearing, that the State committed a Brady violation, that he was denied his constitutional right to a fair and impartial jury, that trial counsel was ineffective during the guilt and penalty phases of the trial, that appellate counsel was ineffective during the direct appeal, that appellate and re-sentencing counsel were ineffective during the re-sentencing hearing, that the prosecution committed overreaching and misconduct, that the trial court failed to utilize a method of properly recording peremptory challenges in the record, and that cumulative effect of these errors rendered his trial fundamentally unfair. Id. at *11-26. After concluding that one of the jurors failed to disclose her relevant history of domestic violence, that Defendant's trial counsel was ineffective in failing to question a juror about her history of sexual abuse, and that the jury was exposed to extraneous prejudicial information during trial, this court reversed the judgment denying post-conviction relief, vacated the Defendant's convictions, and remanded the case to the trial court for a new trial. Id. at *15, 17-18, 20.

Before he was retried, the Defendant filed several pretrial motions. As relevant here, the Defendant filed a Rule 404(b) motion to exclude "any testimony of the prior sexual assault allegations, investigation, and charges against [him], including any testimony by Hope Tharp." The Defendant also filed a motion to substitute counsel.

Following the Rule 404(b) hearing, the trial court denied the motion to exclude evidence regarding the prior sexual abuse allegations against the Defendant. Following a hearing, the trial court also denied the motion to substitute counsel, and the Defendant immediately made an oral request for self-representation, which the trial court also denied.

**Trial.** We have included a brief summary of the evidence presented at the Defendant's January 2022 trial that is relevant to the issues raised on appeal. BG[1] testified that in the spring of 2000, she was seven years old and lived in Bradley County, Tennessee, with her mother and the Defendant, who was BG's step-father. At the time, BG also lived with her nine-year-old brother and the Defendant's daughter, BS. BG said that her father, Stanley Goodman, lived with his wife, Terri Sue Goodman, in Scott County, Tennessee.

BG stated that Defendant sexually abused her multiple times and that the last incident of sexual abuse occurred a few days before Stanley and Terri Sue Goodman were killed. During this last incident, the Defendant called BG downstairs, where he "made [her] perform oral sex on him forcefully" and told her that if she revealed his sexual abuse of her to anyone again, he would kill BG's father. The next day, BG told her teacher, Carrie Trew, about the Defendant's sexual abuse of her the previous night and about what the Defendant had said about killing her father if she disclosed the abuse. BG said that she had previously informed her father about the Defendant's sexual abuse of her, and her father had made a recording, wherein BG detailed the last few incidents of the Defendant's sexual abuse. BG said she had also told her teacher, Carrie Trew, "multiple times" about the Defendant's sexual abuse of her.[2]

---

[1] It is the policy of this court to identify minor victims of sexual abuse by their initials only.

[2] At the conclusion of BG's trial testimony, the trial court provided the following instruction to the jury:

> If you find from the proof that the defendant has committed a crime or crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
>
> The evidence may only be considered by you for the limited purpose of determining whether it provides: the complete story of the crime; that is, such evidence may be considered by you where the prior crime and the present alleged crime are logically related or connected, or are part of the same transaction, so that the proof of the other tends, or is necessary, to prove the one charged, or is necessary to complete an account thereof; and, motive; that is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged.
>
> Such evidence of other crimes, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

BS, who was the Defendant's daughter and BG's step-sister, testified that she was sitting on the stairs the last time BG was sexually abused by the Defendant, which was the night before she and BG were taken into foster care. BS said that although she could not see anything, she overheard the Defendant tell BG that "she needed to open her mouth and put it in her mouth." She said BG "started crying" because she did not want to comply and then "it was quiet" before she heard "something hit, something fall[,] or something being thrown" and heard the Defendant "yelling at [BG]."

Carrie Trew, BG's first grade teacher, testified that on May 16, 2000, BG told her that the Defendant, her step-father, had touched her inappropriately. Trew immediately reported these allegations to the school and to the law enforcement officer at school. Thereafter, Trew and the school's guidance counselor took BG to the restroom, where they observed bruises on BG's arm as well as "welts" on the front of her legs, her vaginal area, and her rear. Trew said that starting in April 2000, BG told her "multiple times" about the Defendant's abuse. She said she had personally seen BG's bruises and did not understand why BG had not already been removed from the Defendant's home.

Hope Tharp, a team leader for the Department of Children's Services (DCS), testified that her first contact with BG and her mother was on March 28, 2000, based on a referral from Scott County. During this interview, BG did not disclose any abuse and simply repeated what another adult had said about BG's grandmother telling lies about the Defendant. Tharp said DCS received a second referral on May 16, 2000, and after a case manager met with BG, Tharp scheduled a meeting with the Defendant and his family that afternoon, although only BG, BG's mother, and BG's brother appeared. During this meeting, BG and her brother were placed into foster care, and BG informed Tharp that her mother had told BG to lie about what happened with the Defendant at the March 28, 2000 interview. Because the Defendant and BS failed to appear at this meeting, Tharp contacted local law enforcement to assist her in locating them, so BS could also be placed in foster care.

When Tharp finally interviewed the Defendant, she explained BG's allegations of sexual abuse, and the Defendant denied the allegations and suggested that BG's father, Stanley Goodman, had "put those ideas" in BG's head. The Defendant specifically referenced a phone conversation he had with Stanley Goodman in February 2000, wherein Goodman played a tape recording of BG detailing the Defendant's abuse of her. During the interview with Tharp, the Defendant offered to "sign something saying he did this" and then go to jail for two or three years, so he, his wife, and his kids could be a family again. However, Tharp informed the Defendant that if this sexual abuse occurred, then the children would be placed in foster care and would not return to him or his wife anytime soon.

Gary Millsaps, a deputy for the Bradley County Sheriff's Department, testified that on May 16, 2000, he went to the Defendant's apartment in an attempt to locate BS, who was being placed in foster care. When the Defendant arrived at home, he was upset about the officers taking his children. While standing a short distance away, Deputy Millsaps overheard the Defendant tell his wife, "If I go to jail for anything, it'll be murder."

Sharra Crowley testified that she had prepared taxes for the Defendant for several years. She said that in 2000, the Defendant claimed that his step-daughter, EG, was a dependent, and when Crowley questioned him about whether EG actually lived with him, the Defendant said that if Stanley Goodman ever tried to take EG from him, he would "blow their brains out." Crowley later warned Terri Sue Goodman, Stanley's wife, about what the Defendant had said.

Tony Alvarez, a lieutenant with the Bradley County Sheriff's Department, testified that he interviewed BG at her school on May 16, 2000. After speaking with BG, he interviewed the Defendant at the school the same day. The Defendant claimed that BG's allegations were false and that they had been "cooked up by the Goodmans in order to create problems for him and his wife." During the May 16, 2000 interview, Lieutenant Alvarez informed the Defendant that Stanley and Terri Sue Goodman were planning to come to Bradley County on May 22, 2000, to petition for custody of the children. Lieutenant Alvarez also interviewed the Defendant the next day, May 17, 2000, and the Defendant questioned why the Goodmans were doing this to him and suggested that the Goodmans had encouraged BG to make these allegations against him. During this second interview, the Defendant announced that "if he was going to jail," it would not be "for sexual abuse or molestation" but "for murder."

On May 20, 2000, Lieutenant Alvarez was notified by law enforcement that Stanley and Terri Sue Goodman had been fatally shot and that the Defendant was the primary suspect. Lieutenant Alvarez interviewed the Defendant for the third time on May 21, 2000, and although the Defendant initially claimed he had never threatened to kill Stanley Goodman, he eventually admitted to making that threat but claimed he did it out of anger and did not mean it. Lieutenant Alvarez said that he interviewed the Defendant's wife, Sherry Farmer, on May 24, 2000, after Farmer had reached out to him. During Farmer's interview, the Defendant suddenly appeared and demanded to speak with his wife. Although Lieutenant Alvarez did not allow the Defendant to speak to Farmer, he became worried about Farmer's personal safety after she indicated that the Defendant was involved in killing the Goodmans. Following this interview, Lieutenant Alvarez placed Farmer in a safe house. He noted that the Defendant was taken into custody for killing the Goodmans on May 26, 2000. Lieutenant Alvarez said that the

Defendant always denied being responsible for killing the Goodmans and for the child abuse but consistently blamed the child abuse allegations on Stanley Goodman.

On cross-examination, Lieutenant Alvarez confirmed that the Defendant was the Tennessee Bureau of Investigation's (TBI's) primary suspect in the Goodmans' killings. He said he was aware of no other suspects in the killings.

Sherry Farmer, the Defendant's ex-wife, testified that prior to being married to the Defendant, she was married to Stanley Goodman, and she and Goodman had three children together, EG, BG, and her son. She explained that in May 2000, EG was living with her father, Stanley Goodman. On May 16, 2000, Farmer went to BG's school and learned that BG had alleged that the Defendant sexually abused her. After BG made this allegation, BG and her brother were taken into foster care. She recalled that when officers appeared at their apartment on May 16, 2000, looking for BS, the Defendant told her in the presence of the officers that "before he would be accused of child molestation, he would be accused of murder first."

Farmer said that on May 20, 2000, the Defendant dropped her off at work around 7:00 a.m. and picked her up at approximately 3:00 p.m. When the Defendant picked her up that afternoon, Farmer noticed a shopping bag, containing a black sweat suit, that had not been in the car that morning. After the Defendant dropped Farmer off at home, he went to The Muffler Shop. The Defendant returned home about an hour later but left again in the early evening, telling Farmer only that he "was going to Scott County" to "take care of stuff[.]" She said the Defendant returned home around 1:00 a.m. At approximately 3:00 a.m., Danny Mason showed up at their apartment asking to talk to the Defendant, but she was unable to awaken the Defendant. Late Sunday morning, Farmer and the Defendant went to eat at Denny's with Danny Mason and Mason's girlfriend. At some point on Sunday, the Defendant confessed to Farmer that he had killed the Goodmans, explaining that he killed Terri Sue only because "she woke up." The Defendant said that after killing the Goodmans, he "burned" the black sweat suit, threw the gun he used "in the river," and bought new tires for his car. The Defendant said he put garbage bags "over his shoes" before shooting the Goodmans. On May 24, 2000, Farmer called Lieutenant Alvarez and met with him. During this meeting, the Defendant suddenly appeared and wanted to talk to her. Lieutenant Alvarez later took her to a safe house.

Because Christy Swallows was deceased at the time of the Defendant's second trial, the State presented Swallows' testimony from an earlier proceeding in lieu of her testimony at trial. Swallows stated that she first met the Defendant when he asked her to babysit his children. On the week of May 14, 2000, Swallows said the Defendant told her that he and his family were moving back from Scott County because of an

investigation regarding the molestation of the children. When Swallows asked him questions about this, the Defendant replied that Stanley Goodman had played a tape of EG and BG to him. She said the Defendant, referring to Stanley Goodman as "that bastard," said that "[t]hat bastard in Scott County did this" and that he was going to kill Goodman "for this."

Swallows said that approximately a week later, the Defendant banged on her door and told her that Sherry Farmer had left him and that Farmer was talking to the police. At the time of this conversation, Swallows knew that Stanley and Terri Sue Goodman had been killed. When she asked the Defendant if he killed the Goodmans, the Defendant initially denied being responsible but later admitted that he killed them, stating that "[t]here was blood everywhere" and that he "blowed them some-of-a-bitches full of holes." Swallows said that the Defendant also told her that he purchased the gun he used in the killings from "Danny."

On cross-examination, Swallows admitted that she and the Defendant had an affair and got to be close friends before the Defendant was arrested in this case. She said that after the Defendant admitted to her that he killed the Goodmans, she contacted law enforcement.

Because Preston Adams was deceased at the time of the Defendant's second trial, the State presented Adams' testimony from an earlier proceeding in lieu of his testimony at trial. Adams stated that he got to know the Defendant through work. He said the Defendant told him that he was going to be charged with child sexual abuse and blamed Stanley Goodman for initiating the charges. The Defendant then inquired where he could purchase a .22 or .25 pistol, and when Adams told him he did not know where he could get one of those guns, the Defendant said that "he was going to take care of the damn problem" before "it could escalate any further." The Defendant also told Adams he knew Stanley Goodman was going to Bradley County in the next few days. Adams claimed that he did not have a gun to give or loan the Defendant.

Adams said that at work on May 20, 2000, the Defendant told him he "hadn't had any sexual contact with the children . . . but he wasn't going to let them come down there before he took care of that." Although Adams tried to talk the Defendant out of taking care of Stanley Goodman, the Defendant claimed "he had already made up his mind." The Defendant dropped Adams off at home at 12:30 p.m. on May 20, 2000, and Adams said he did not see the Defendant again until 8:00 or 9:00 a.m. the next morning when the Defendant and his wife came to see him at the Budget Motel where he was staying. Adams said that when his girlfriend and the Defendant's wife went outside, the Defendant admitted to him that he killed the Goodmans. The Defendant told Adams that he had bought a sweat suit and gloves and that he had removed the "hair follicles off of

his body." He also said that after committing the killings, he burned his clothes and "burnt the stock of the gun and buried the rifle part." In addition, the Defendant told Adams that he bought "oversized shoes" to make it look like a bigger man committed the crimes and that he "changed the tires on his vehicle" to disguise his car. The Defendant said he shot the Goodmans in their bedroom, even though this information had not been reported on the news.

EG[3] testified that she was the daughter of Stanley Goodman and Sherry Farmer and that her siblings were BG and her brother and that her step-sister was BS. In May 2000, EG was thirteen years old and was living with Stanley Goodman. She said she routinely went to the races with her aunt every Saturday night and that her father left the front door to their house unlocked, which the Defendant knew. EG said that when she returned to Stanley and Terri Sue Goodman's home at 11:00 p.m., her dogs and cats were "acting weird," the porch light that was normally on was turned off, and she felt like she was "being watched." EG said she never saw her father and step-mother before she went to bed that night and did not discover that they had been killed until the next morning.

Danny Mason testified that he was currently incarcerated for an aggravated stalking conviction. He stated that he and the Defendant were close friends and that he had lived with the Defendant for a period of six months. Mason stated that on Saturday, May 20, 2000, between 5:30 and 6:00 p.m., the Defendant drove to The Muffler Shop while he was working and asked for the automatic .22 rifle that Mason had sold him and had been storing for him at Mason's mother's home. Mason said the Defendant told him that he "wanted to relieve some steam" by target practicing with the rifle. The Defendant drove Mason to his mother's home, and Mason got the rifle and placed it in the Defendant's trunk. The Defendant then dropped Mason off at work and said he was "going to take care of some business in Scott County[.]" At the time, Mason was aware that the Goodmans lived in Scott County and that Stanley Goodman had previously called DCS on the Defendant, which resulted in the Defendant's children being taken away from him.

Mason next saw the Defendant at 3:30 a.m. on Sunday morning when Mason went to the Defendant's apartment after fighting with his girlfriend and saw that the Defendant was "passed out on the couch." Mason said he talked to Sherry Farmer for a few minutes and then left. Mason next saw the Defendant again at 8:30 a.m. on Sunday, when the Defendant and Farmer came to take Mason and his girlfriend out to Denny's. Mason rode to Denny's with the Defendant, who told him that he had "shot Stanley" when he went to Scott County the previous night after obtaining the rifle. When the Defendant

---

[3] At the time of this trial, the witness had married. For the sake of clarity, we will continue to refer to her as we have prior. We intend no disrespect.

made this statement, Mason had not heard that Stanley and Terri Sue Goodman had been killed. When they got to the restaurant, Mason and the Defendant went to the restroom, and the Defendant repeated that he had shot Stanley Goodman, although he never mentioned anything about shooting Terri Sue Goodman. After eating at Denny's, the Defendant and Mason went to The Muffler Shop to look "at a set of tires that he was wanting to purchase" from a friend of Mason's girlfriend. The Defendant ultimately purchased only two tires because he did not have enough money for all four tires. Mason claimed that he often rode with the Defendant to Scott County on the back roads and that because the Defendant drove at a speed of over a hundred miles an hour, the trip only took them between an hour and fifteen minutes to an hour and thirty minutes, depending on traffic.

On cross-examination, Mason acknowledged that he had been convicted of four felonies. He stated that when the Defendant said he was going to take care of some business in Scott County, he thought "he meant Mr. Goodman" but was not sure.

Hilary West testified that she was a friend of the Defendant in 2000 and that she had received a few letters from the Defendant while he was facing some legal trouble involving Stanley and Terri Sue Goodman. West said she received a December 27, 2000 letter from the Defendant, wherein the Defendant told her that he "need[ed] an alibi very badly" for the time period between 8:00 p.m. and 9:30 p.m. on May 20, 2000, and needed "a chick to step up and tell them about the back seat we shared." West said she also received a March 23, 2001 letter from the Defendant, wherein the Defendant asked her to provide the following alibi for him:

> I called Rick's and you answered. We talked for a few and I agreed to loan you some money but you had to meet me in Kingston but I couldn't be there till late. I did get to the lake about nine p.m., and I had [Beth] from hilltop with me. You remember, short blonde hair, a hundred and ten pounds, five foot three. So we rode over to the liquor store, and I went in wearing a black pair of jogging pants and a tee shirt. We got back to your car, and you and I talked for a while. About 10:30 you took off for home and we said we was headed for Chattanooga. That's all you know. You swear you don't think I was in any rage. I was getting Beth and leaving Sherry and her family behind. That's short and sweet and no confusion. I'll make it up to you tenfold when I get out of here.
>
> Now, I've not given Ron your name yet but I'm going to this week. The only way you can get in trouble doing this is change your story after you give it. That is absolutely the only way. I have Ron, I have Jeffers, and we've got me to keep the Scott County detective at bay and off your ass.

- 9 -

I've got everything covered for you, but for sure this is the story I want you to use.  This way there is nothing funny going on.

West said that she never offered to help with the Defendant, although she willingly wrote letters to him.

Dinnah Angel Moses, a special agent forensic scientist with the TBI, was accepted as an expert in the field of firearms identification.  Agent Moses testified that she compared the nine .22 caliber shell casings collected from the Goodman's home and determined that all nine of these casings were fired from the same firearm.

The autopsy results showed that Stanley and Terry Sue Goodman each suffered four gunshot wounds to the face, which caused their deaths.  With regard to the timing of the Goodman killings, Agent Charles Scott with the TBI testified that it took two to two and a half hours to drive from the Defendant's apartment in Cleveland, Tennessee to the Goodman's home in Huntsville, Tennessee.  Law enforcement officers found in the Defendant's car at his residence a Dollar General Store receipt for a sweatshirt and sweatpants that were purchased at 2:37 p.m. on May 20, 2000.

Tinnie Crumley's January 4, 2022 deposition was presented by the State at the Defendant's trial in lieu of her testimony.  Crumley stated that she worked at Dollar General Store in 2000 and that the store's records showed that a sweatshirt and sweatpants were purchased at that store on May 20, 2000.  Crumley recalled a man purchasing a black sweatshirt and sweatpants on that date, and when she told him that he was going to "burn up" in those clothes because it was summertime, the man replied that he was "going camping."  Crumley confirmed that the Dollar General receipt found in the Defendant's car showed that the sweatshirt and sweatpants had been purchased from the store where she worked.  She acknowledged that although she was shown a lineup in this case, she was unable to identify anyone as the man who purchased the sweatshirt and sweatpants on May 20, 2000.

A. Wayne Carter, an attorney with the public defender's office who represented the Defendant in 2002, testified that BG signed an affidavit shortly after the killings, stating that the sexual abuse allegations BG made against the Defendant were false and that someone had encouraged her to concoct this story about the Defendant.  On cross-examination, Carter acknowledged that because BG was a child at the time, an adult would have had to bring her to his office, although he did not recall the identity of this adult.  Carter acknowledged that it was not uncommon for children to recant their statements and that a recantation did not necessarily mean that the abuse did not occur.

The Defendant testified on his own behalf at trial. He claimed that when BG's sexual abuse allegations were referred to DCS in 2000, he did not blame Stanley and Terri Sue Goodman but blamed Sherry Farmer's sister, mother, and father. The Defendant claimed that his statement to Farmer that he would "much rather go to jail for a murder charge than . . . child molestation" was not a threat but a recognition of how child molesters were treated in prison.

The Defendant stated that on May 20, 2000, he had a conversation with Preston Adams. The Defendant then asked Danny Mason at The Muffler Shop if he still had the .22 rifle, and Mason agreed to let the Defendant use it. The Defendant said he picked up Adams around 2:00 p.m. that day, and they stopped at the Dollar General store. Adams went inside briefly and came out carrying a couple of bags containing dark clothing. The Defendant and Adams then went to a house where Adams purchased drugs and then the Defendant dropped off Adams at home. The Defendant said he went back to The Muffler Shop until Sherry Farmer, his wife, called, and he left to pick up Farmer at work. After picking her up, the Defendant said he confronted Farmer about a potential affair between her and Adams, which caused them to argue. The Defendant and Farmer returned home, and then the Defendant left around 4:00 or 4:30 p.m. and went back to The Muffler Shop to talk to Mason. The Defendant and Mason drove to Mason's mother's home to get the .22 rifle, and the Defendant told Mason to put the rifle in the trunk of the Defendant's car. Once the Defendant returned home, he tried to get Farmer to go with him to Atlanta for the purpose of locating Molly Wimpey, the woman who was the mother of his children. The Defendant said he told Farmer he knew about "the plan" and that she was "a freaking fool." He also told Farmer that the rifle was in the trunk of his car. The Defendant then stated that he "didn't think [Farmer and Adams] would do it," and he "begged her not to go." The Defendant said that Farmer dropped him back to The Muffler Shop around 7:30 or 8:00 p.m. before Farmer took their car to meet Adams.

The Defendant then stated that he took several Xanax and started drinking beer and smoking marijuana with some of the guys at The Muffler Shop. Because Mason and his girlfriend had already left, the Defendant did not have a ride, so he walked to the Hilltop Bar, which was between The Muffler Shop and his home. The Defendant got to the bar around 10:15 p.m. and took some more Xanax pills. He said he began causing trouble at the bar, so he was asked to leave. The Defendant said he then walked home, arriving there around 11:00 or 11:30 p.m. He said that there was no one home and no cars, including his car, in the driveway when got home, and he "crashed on the couch" until 11:00 a.m. the next morning when Farmer woke him up. The Defendant said he and Farmer went over to Mason's home "trying to find out what he wanted," and Mason asked him "what happened," and the Defendant did not respond because he did not know what had happened. He noted the dark clothes that Adams had purchased the day before were no longer in the back seat of his car. While at Mason's home, they decided to get

some breakfast at Denny's. The Defendant said he rode with Mason, and they discussed Mason's giving him the .22 rifle. The Defendant told Mason that he did not know the location of this rifle, that he did not know anything about what happened, and that Mason "needed to keep his mouth shut" because if "this [went] bad, it could be real bad." The Defendant denied telling Mason on the way to Denny's that he killed anyone and claimed he said he "didn't know." The Defendant also denied telling Mason in the restroom of Denny's that he killed someone; instead, he claimed that he and Mason never went to the restroom together. The Defendant said that after they ate, they went to The Muffler Shop, and the Defendant talked Mason into selling him two tires for Farmer's Camaro. While there, he popped the trunk to his car, realized that the rifle was no longer there, and put the two tires in the trunk.

The Defendant said he later contacted Detective Wade Chambers at the Scott County Sheriff's Office, told him he knew that the Goodmans had been shot and that law enforcement was looking for him, and then offered his assistance. The Defendant acknowledged that he provided the .22 rifle to Farmer and Adams so they could kill the Goodmans and admitted he took Adams "to the dollar store and helped him prepare, more or less." The Defendant said that he made several statements that were different from the testimony he had just given because he was afraid that if he said he put the .22 rifle in the car for Farmer and Adams and helped them, then the Defendant would also "go to prison." The Defendant stated that he was "the only one paying for this" but he was "not the only one responsible" and that he had already served twenty-one and half years, including thirteen years in isolation. The Defendant claimed that he never went to Scott County that night, never went inside the Goodmans' home, and never shot the Goodmans.

On cross-examination, the Defendant admitted that he had been convicted of two counts of theft in Scott County and that he had not conducted himself with honesty when he committed those crimes. The Defendant also acknowledged that he had not been honest when he committed the one count of forgery and three counts of burglary in Georgia, of which he was also convicted. The Defendant denied telling Tinnie Crumley at the Dollar General Store that he was going camping on May 20, 2000, and claimed that he had never seen Crumley before she was deposed. He acknowledged that he showed Crumley a photograph of Adams at her deposition with the hope that she would say that Adams purchased the sweatshirt and sweatpants that day. The Defendant acknowledged this was the first time he had publicly blamed Preston Adams for killing the Goodmans.

The Defendant denied sexually abusing BG and claimed BG was told to make these allegations by her grandparents and Stanley Goodman. He also denied telling BG that he would kill her father if she disclosed the abuse. The Defendant acknowledged that both BG and BS testified that they heard him say, "Open your mouth and put it in

your mouth." However, he claimed that BG and BS conspired against him. The Defendant also denied telling Christy Swallows that Stanley Goodman had lied about the allegations that he had sexually abused BG and that the Defendant was going to "kill him for this." He also denied telling Christy Swallows that he blew Stanley and Terri Sue Goodman "full of holes." The Defendant later acknowledged that he may have made some threatening statements regarding Stanley Goodman because Goodman had recorded BG's statement regarding the sexual abuse.

The Defendant denied that Detective Alvarez told him that Stanley Goodman was coming on May 22, 2000, to petition for custody of the children. In addition, the Defendant denied telling Preston Adams, "Stanley Goodman initiated a child sex abuse charge [against him] and is coming to Cleveland the first of the week, and I'm not going to let him come before I take care of it." The Defendant also denied telling Danny Mason and Sherry Farmer that he was going to Scott County to "take care of stuff" or "take care of business."

The Defendant acknowledged that the condition of all nine shell casings recovered in this case were consistent with them being fired from a semi-automatic weapon, which was consistent with the rifle Danny Mason said he gave the Defendant. He also admitted that BG told her teacher, Carrie Trew, that he had been sexually abusing BG on May 16, 2000, and that the Stanley and Terri Sue Goodman were killed only four days later on May 20, 2000. The Defendant also acknowledged asking Hilary Cooper to be his alibi and admitted that he lied to her "over and over" so she would help him. He claimed that someone named "Tina" was going to be his alibi, but his attorneys did not find her until a year after his first trial, and then Tina passed away.

At the conclusion of the Defendant's retrial, the jury convicted him as charged of two counts of first degree premeditated murder, and the Defendant received consecutive life sentences without parole for each conviction. Thereafter, the Defendant timely filed a motion for new trial and amended motion, arguing in pertinent part that the trial court erred in denying his request for self-representation and erred in admitting testimony regarding the allegations of his sexual abuse of BG. Following the trial court's denial of these motions, the Defendant timely filed a notice of appeal.

## ANALYSIS

**I. Motion to Waive Counsel.** The Defendant argues that the trial court erred in denying his right to self-representation, as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. He asserts that the trial court erred in denying his motion to waive counsel without a hearing, in finding that the Defendant was not capable of representing himself without making any

other findings, and in not inquiring into why the Defendant wanted to represent himself. The Defendant claims that the court's finding that he was not capable of representing himself was "far from a proper justification" to deny his request for self-representation and maintains that "the procedural history of this case shows that [he] was more than capable of representing himself in various complicated proceedings." The Defendant also contends that because he timely filed his waiver of counsel, asserted his right to self-representation clearly and unequivocally, and knowingly and intelligently waived his right to counsel, his case should be remanded for a new trial, where he should be afforded the opportunity to represent himself. In response, the State asserts that the trial court properly denied the Defendant's motion to waive counsel, insisting that the Defendant never properly invoked his right of self-representation because he failed to make a clear and unequivocal waiver of the right to counsel. We conclude that the trial court did not err in denying the Defendant's motion to waive counsel because the Defendant failed to clearly and unequivocally assert his right to self-representation and because the record shows the Defendant did not genuinely want to represent himself and was simply manipulating the judicial process to obtain a attorney of his choosing or to delay trial.

Initially, we recognize that a criminal defendant has not only the right to be represented by counsel but also the right to self-representation. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; see State v. Hester, 324 S.W.3d 1, 30 (Tenn. 2010); Tenn. R. Crim. P. 44(a) ("Every indigent defendant is entitled to have assigned counsel in all matters necessary to the defense and at every stage of the proceedings, unless the defendant waives counsel."). The right to counsel and the right to self-representation are alternative rights, with the defendant able to assert one or the other but not both. Lovin v. State, 286 S.W.3d 275, 284 (Tenn. 2009). The right of self-representation exists "'despite the fact that its exercise will almost surely result in detriment to both the defendant and the administration of justice.'" State v. McMiller, No. E2015-01597-CCA-R3-CD, 2016 WL 3947878, at *3 (Tenn. Crim. App. July 18, 2016) (quoting State v. Fritz, 585 P.2d 173, 177 (Wash. Ct. App. 1978)).

The issue of whether a defendant has exercised his right of self-representation and has simultaneously waived his right to counsel is a mixed question of law and fact that this court reviews de novo, accompanied by a presumption that the trial court's factual findings are correct. Hester, 324 S.W.3d at 29-30. "An error in denying the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs." Id. at 30 (citing State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

In order to exercise the right of self-representation, a defendant must waive his right to counsel, and this waiver may occur at any stage of the proceedings. Id. However, "[c]ourts should indulge every presumption against waiver of the right to

- 14 -

counsel." Lovin, 286 S.W.3d at 287 n.15 (citing Brewer v. Williams, 430 U.S. 387, 404 (1977); State v. Worrell, 660 S.E.2d 183, 185 (N.C. Ct. App. 2008); Williams v. State, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008); State v. Vermillion, 51 P.3d 188, 192-93 (Wash. Ct. App. 2002)). Courts have typically "assigned a constitutional primacy to the right to counsel over the right of self-representation." Hester, 324 S.W.3d at 30. "'[I]t is clear that it is representation by counsel that is the standard, not the exception.'" Id. (quoting Martinez v. Court of Appeal of Cal., 528 U.S. 152, 161 (2000)).

In order to exercise the right of self-representation, "(1) a defendant must make the request in a timely manner; (2) the assertion of the right of self-representation must be clear and unequivocal; and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel." Id. at 30-31 (citing State v. McCary, 119 S.W.3d 226, 256 (Tenn. Crim. App. 2003); State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988); United States v. Bush, 404 F.3d 263, 271 (4th Cir. 2005); United States v. Mackovich, 209 F.3d 1227, 1236 (10th Cir. 2000); W. Mark Ward, Tennessee Criminal Trial Practice §8:4, at 220 (2009)). "Before accepting a waiver of counsel," the trial court must "advise the accused in open court of the right to the aid of counsel at every stage of the proceedings" and must "determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters." Tenn. R. Crim. P. 44(b)(1)(A), (B) (emphasis added). The defendant's waiver of the right to counsel must be in writing and must be included in the record. Tenn. R. Crim. P. 44(b)(2), (b)(3).

However, "[t]he right of self-representation is not absolute." Hester, 324 S.W.3d at 31 (citing Indiana v. Edwards, 554 U.S. 164, 171 (2008)). Even if a defendant's invocation of the right of self-representation meets the aforementioned requirements, "the effectiveness of the defendant's invocation and waiver is not a foregone conclusion." Id. Notably, there is no right of self-representation when a defendant "seeks to abuse the dignity of the courtroom or to engage in serious obstructionist misconduct." Id. (citing Edwards, 554 U.S. at 171). In other words, defendants are not allowed to use the right of self-representation "'as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process.'" Id. (quoting United States v. Mosley, 607 F.3d 555, 558 (8th Cir. 2010)). "A court may deny a manipulative request for self-representation, distinguishing between a genuine desire to invoke a right of self-representation and a manipulative effort to frustrate the judicial process." Id. at 33 (citations omitted).

"[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself." Godinez v. Moran, 509 U.S. 389, 399 (1993) (footnote omitted). "[A] criminal

defendant's ability to represent himself [or herself] has no bearing upon his [or her] competence to <u>choose</u> self-representation." <u>Id.</u> at 400 (footnote omitted). <u>Hester</u> explained:

> A trial court may properly conclude that a defendant is likely to be incompetent and ineffective as an advocate in his or her own defense and that the defendant lacks important knowledge about substantive and procedural law; however, these conclusions, without more, do not render the defendant incompetent or unable to waive the right to counsel.

324 S.W.3d at 32. This is because "[d]eficiencies in legal skills and legal knowledge do not deprive a person of his or her right to self-representation." <u>Id.</u>

In <u>State v. Hester</u>, the trial court declined to allow Hester to represent himself. <u>Id.</u> at 28-29. On appeal, the Tennessee Supreme Court held that while the trial court's concerns about Hester's lack of knowledge of the law and lack of competence as a communicator and advocate did not support the denial of the defendant's request to represent himself, the trial court's finding that Hester was attempting to manipulate the judicial system did provide adequate support for the trial court's denial of the request for self-representation. <u>Id.</u> at 33. After detailing the trial court's ruling concerning this denial, the Tennessee Supreme Court held that it understood this ruling as reflecting its findings that Hester "was trying to manipulate the process to obtain a new lawyer or to have [his former lead attorney] reappointed as lead counsel" and that Hester "did not have a genuine desire or intent to represent himself at trial." <u>Id.</u>

In this case, at the pretrial hearing on the motion to substitute counsel, the Defendant stated, "Your Honor, I filed a motion to substitute counsel, and I wanted to make it clear that I'm not asking to go pro se." The Defendant added that "[a]t this stage in the proceedings," he needed "experienced trial counsel." He claimed that current trial counsel had erroneously informed him that his attorneys at his first trial failed to impeach Preston Adams with Adams' numerous convictions. The State countered that at the time of the Defendant's first trial, Adams did not have any convictions that would have been admissible for the purposes of impeachment, although Adams received "some convictions later on." The Defendant said he had trusted trial counsel's claim that there was impeachment evidence available against Adams, even though he never asked to see the convictions. The Defendant said he later testified under oath that he had seen Adams' convictions, and when the State argued that there was no available impeachment evidence against Adams, the Defendant said it made him "look like a liar" and "upset" him.

The Defendant also claimed that current trial counsel was unable to explain why Adams' rent receipts were important. He claimed that Adams had "built his statement that [the Defendant] confessed to him at a location that [Adams] didn't even live in until a month after [the Defendant] was incarcerated." The Defendant asserted that even though current trial counsel knew that the new investigator would not know anything about Adams' rent receipts because they were found by the old investigator, trial counsel asked the new investigator about the rent receipts anyway. The Defendant argued that current trial counsel could have called the lady who gave Adams' rent receipts to the old investigator, but counsel refused to do so. The Defendant asserted that he did not trust current trial counsel and did not have "any confidence in his work."

The Defendant additionally argued that current trial counsel and the State were bound by the Tennessee Supreme Court's prior ruling on the Rule 404(b) issue regarding allegations that he sexually abused BG. The Defendant claimed that current trial counsel should have filed a Rule 12 motion to strike this evidence on retrial, and then should have appealed the trial court's denial of this motion, because the Tennessee Supreme Court had already held that regardless of the veracity of BG's allegations that the Defendant sexually abused her, this evidence was "overly prejudicial." The Defendant maintained that current trial counsel did not have "enough experience to handle a case like this" and that even though trial counsel could have called witnesses to counter the evidence that the sexual abuse occurred, he failed to do so. When the trial court noted that the Defendant was free to call these witnesses at his new trial, the Defendant replied, "Absolutely." The Defendant then asserted, "But that's after the child rape is already in, and that's what we're trying to prevent. We're trying to prevent the prejudice that got this case remanded the first time." The Defendant then said he did not "feel comfortable with [current trial counsel] as [his] lead attorney in this case."

The State asserted that it believed current trial counsel had properly handled the Rule 404(b) issue by having a Rule 404(b) hearing prior to the new trial. The State also argued that although the Defendant claimed the Tennessee Supreme Court held that the "child sex abuse [wa]s overly prejudicial," that court actually held that "the hearsay testimony of Hope Tharp was overly prejudicial" but that admission of this evidence "wasn't grounds for overturning the case." Consequently, the State argued that there was "no precedent that had to be upheld on remand." The State then added:

> What the State brought before the Court, and what [Defendant's current trial counsel] appropriately responded to and defended against, was the testimony of the actual children, which is not the same as hearsay testimony through Hope Tharp [that was presented at the Defendant's first trial]. It's not an issue that had been previously . . . determined by Justice Wade [in the Tennessee Supreme Court opinion], and we do believe that it was dealt with

in an appropriate manner and that [Defendant's trial counsel] did not demonstrate any lack of appropriate assistance of counsel.

The Defendant countered that he pursued a "shotgun" strategy of the Rule 404(b) issue on appeal and that "Justice Wade ruled on each individual issue that [he] brought." He said that in the end, the ruling that got his sentences reversed and his case remanded was that the evidence of the sexual abuse of BG was "overly prejudicial." He noted that Justice Wade ruled that "there was all kinds of other evidence to show motive and that the details of this child rape stuff was absolutely cumulative." Defendant's trial counsel stated that because the Defendant had testified that trial counsel "lied to him" and that he did not trust him, it had put him "in a predicament ethically to continue [his] representation[.]" However, trial counsel said that he was "not asking to be removed" and that he would do whatever the court asked [him] to do.

The trial court noted, "[I]f counsel were allowed to withdraw every time that his client said he was being dishonest or lying to him, I think it would be very difficult to obtain appointed counsel in a lot of cases." The court also remarked that it was "significant the number of appointed counsel that [the Defendant] had in the past[,]" which was highlighted in the State's response to the Defendant's motion and was based on the record in this case. The Defendant replied that the State's response was "talking about [his] numerous previous lawyers and the fact that [he] just kept getting morons [appointed to him] before [his] post-conviction." The Defendant claimed that even though his previous attorneys were telling him that his issues were not winnable, he "was able to win several constitutional violations." When the trial court asked if current trial counsel was the Defendant's "latest moron," the Defendant said, "No, I am not. That's not what I'm saying at all." The Defendant added:

I know I've [gone] through a bunch of attorneys. I'm not denying that. But I have ultimately gotten relief. Every time this case has left Scott County and I've got[ten] to the appellate court, I've had lawyers [who] were capable of getting me relief. I know a good lawyer. I know someone [who] can cross-examine witnesses. I can watch them in the courtroom a couple of times. I know if they're going to be effective or not. I mean, you do too. . . . And a hundred and eighty-five students graduate law school: Somebody's number one; somebody's number three hundred and eighty-five, you know. I don't want the three hundred and eighty-fifth guy. Just because he's qualified and he's got papers saying he's an attorney doesn't make him an experienced trial attorney.

The Defendant asserted that the State had "no direct evidence" against him and that he needed an attorney who knew when witnesses were lying. He said that at the

recent Rule 404(b) hearing, BG and BS contradicted their previous statements and "their stories were so similar" that they had to have been a result of "collusion[,]" but current trial counsel never pointed this out. The Defendant said he needed "a trial attorney that . . . as soon as one of these witnesses tell[s] a lie they can be right on top of it" and that was "not the case with the cross-examinations [he had] seen with [current trial counsel]."

The trial court recalled that when it was first designated to hear this case it had been very difficult to find an attorney to represent the Defendant because he had been previously represented by so many of the district's defense attorneys. The court noted that Defendant's current trial counsel, who was a criminal defense attorney from Sparta, Tennessee, a couple hour's drive from the courthouse, was ultimately appointed to represent the Defendant, and that Defendant was now asking to substitute another attorney for trial counsel. The court also recognized that the Defendant had just told the court that he did "not want to proceed pro se" and instead wanted "experienced trial counsel." The court remarked that the Defendant had come into court two weeks prior and informed the court that he could "make a bond of two hundred thousand dollars or so" and that if the Defendant was "capable of making a bond like that," he might "want to consider hiring an attorney to represent" him, but that if the Defendant hired counsel, he needed to be ready to go to trial in January. The trial court also recognized that the Defendant's issues with current trial counsel arose after he lost the motions concerning the admission of Preston Adams' testimony from the Defendant's first trial and the Rule 404(b) evidence. The court held that the Defendant was "not entitled to relitigate those motions[,]" which it felt had been decided correctly and which the Defendant was free to raise on direct appeal if he wished.

Citing State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000), the trial court asserted that the Defendant did not have the right to appointed counsel of his choosing. The court also found that the complaints the Defendant had with current trial counsel were very similar to the complaints he had made regarding his other eleven attorneys, most of whom he had filed a complaint against with the Board of Professional Responsibility and/or had argued that they had provided him with ineffective assistance of counsel. The trial court asserted that if the Defendant continued to make attacks upon current trial counsel he might "forfeit [his] right to be represented by an attorney in this case." The court then made the following findings about the Defendant:

> You stated earlier that you wanted an attorney to represent you, and you should have an attorney representing you. You're uneducated in the law and you have no ability . . . to represent yourself . . . . But you need to keep in mind that if you continue—that your conduct in the future could result in a waiver or forfeiture of your right to counsel.

The court then referenced the holding in Carruthers that "a finding of forfeiture is appropriate only where a defendant egregiously manipulates the constitutional right to counsel so as to delay, disrupt, or prevent the orderly administration of justice" and that "[w]here the record demonstrates such egregious manipulation[,] a finding of forfeiture should be made and such a finding will be sustained, even if the defendant is charged with a capital offense." Id. at 550. The court then warned the Defendant that he could forfeit his right to counsel if he engaged in conduct that appeared to be "an effort to manipulate or delay the trial of the case or to disrupt it."

Thereafter, the trial court denied the motion to substitute counsel, stating that current trial counsel was a "highly competent attorney who ha[d] zealously represented [the Defendant]." It noted that the Defendant's motion was related to "two or three motions upon which [trial counsel] did not prevail" and that the court was satisfied that its rulings on those motions were correct. The trial court also said, "I've seen nothing whatsoever about [trial counsel]'s performance as a lawyer which would make him ineffective in his representation of you[.]"

When the court asked the State to prepare an order denying the Defendant motion to substitute counsel, the following exchange occurred:

| The Defendant: | Your Honor, I have a subsequent motion I'd like to file with the [c]ourt right now, if you don't mind. |
|---|---|
| The Court: | I do mind. You're represented [by counsel]— |
| The Defendant: | It's actually a waiver of counsel, Your Honor. |
| The Court: | I'm not going to accept it, [Defendant]. You're not capable of representing yourself. You told me earlier at the outset you did not want to proceed pro se. You said you wanted experienced trial counsel, which I think you have. I'm not going to accept your waiver. You may file it and put that in the record. |
| | If the State would please when preparing the order . . . also prepare one rejecting his waiver [of counsel]. |

At the motion for new trial hearing, the trial court concluded that although the pretrial motions "did not turn out the way the [D]efendant wanted," Defendant's trial counsel "was competent" and had provided "effective assistance of counsel." The court

also noted the Defendant's extensive "history of attacking his appointed defense counsel," stating:

> Of the eleven previous attorneys . . . who have been appointed to represent the [D]efendant in various stages of this case, [the Defendant] has accused seven of them of rendering ineffective assistance and [has] filed B[oard of Professional Responsibility] complaints against at least two. The [D]efendant has the right to appointed counsel but not the right to choose counsel. The [D]efendant is not entitled to a meaningful relationship with his defense attorney. The [c]ourt found those facts existed then. They exist today.

The trial court then considered the Defendant's claim that it was error for the court to deny the Defendant's pretrial motion for self-representation:

> The [c]ourt found the [D]efendant is not competent to represent himself in a case in which he is charged with two counts of first degree murder where the State is seeking a sentence of life without the possibility of parole. Secondly, [trial counsel] is competent and has provided the effective assistance of counsel.

> [Defendant], in short, the [c]ourt found at that time and finds today that you are not competent to represent yourself in a case of this nature involving two homicides. You have no legal training other than what you may have picked up on your own, and you've shown no reason to allow you to represent yourself. I think we discussed the possibility of elbow counsel. I also think you eventually decided you wanted [trial counsel] to represent you. But be that as it may, the [c]ourt found you were not competent to represent yourself in a case of this nature.

Here, the Defendant argues that the trial court never determined whether he was making a manipulative effort to frustrate the judicial process or was making a genuine desire to invoke his right of self-representation because the trial court immediately denied the Defendant's waiver of counsel as it was being filed with the clerk in open court. He adds that although he timely filed this waiver, asserted his right to self-representation clearly and unequivocally, and knowingly and intelligently waived his right to counsel, the trial court (1) never conducted an inquiry into the genuine nature of his request, (2) never made a proper finding as to why it was denying the Defendant's request, and (3) failed to conduct a review of the requirements of the motion. Instead, he claims the trial court "forced [him] to be represented by counsel that he believed lied to him." The Defendant asserts that unlike the record in Hester, which showed manipulative and

retaliatory tactics by the accused, there is no such record in his case. Consequently, the Defendant argues that his case should be remanded for a new trial, thereby affording him the proper opportunity of self-representation as guaranteed by the United States Constitution and the Tennessee Constitution.

Before determining this issue, we must first consider the Defendant's November 7, 2023 pro se motion to supplement the appellate record with his motion to waive counsel as well as the State's December 8, 2023 motion to strike the Defendant's motion to supplement the record. At the time the Defendant filed this motion to supplement, the Defendant was, and continues to be, represented by counsel. It is well established that this court may not consider any pro se filing by a defendant while the defendant is represented by counsel. State v. Smith, 492 S.W.3d 224, 242 (Tenn. 2016) ("[A] defendant may not proceed pro se while simultaneously represented by counsel."); State v. Muse, 637 S.W.2d 468, 470 (Tenn. Crim. App. 1982) (stating that a defendant may not file pro se motions while represented by counsel). On January 4, 2024, the Defendant changed his tactic and filed, with the assistance of his counsel, a motion to correct or supplement the record with the motion to waive counsel. We conclude that there is absolutely no need to supplement the record in order to determine whether the trial court erred in denying the Defendant's right to self-representation. Tennessee Rule of Criminal Procedure 44 makes it clear that a written waiver of the right to counsel is only required when a trial court permits the defendant to proceed pro se. See Tenn. R. Crim. P. 44(b)(2), (b)(3). Therefore, "[t]here is no requirement that the request for permission to waive the right to counsel and proceed pro se be in writing." State v. Alderson, No. M2015-01395-CCA-R3-CD, 2016 WL 5543266, at *8 (Tenn. Crim. App. Sept. 29, 2016) (citing State v. Hessmer, No. M2012-01079-CCA-R9-CD, 2013 WL 1249022, at *2 (Tenn. Crim. App. Mar. 28, 2013) (rejecting the State's claim that failure to include a written waiver of the right to counsel waived the claim to self-representation and reversing the trial court's denial of the motion to proceed pro se)). In this case, the Defendant first filed a motion to substitute counsel, which the trial court denied. The Defendant then requested that he be allowed to assert his right of self-representation, which the trial court also denied. Because the Defendant "was not required to introduce a written waiver of the right to counsel when the trial court . . . determined that he would not be permitted to waive the right to counsel," we do not find the absence of a written waiver in the record "to be dispositive[,]" and accordingly deny the motion to supplement the record. See id.

Initially, we conclude that the Defendant's request for self-representation was not clear and unequivocal, as is required. The Defendant spent the majority of the hearing on his motion to substitute counsel arguing that he needed an experienced trial attorney to represent him in this case. He specifically asserted that he was "not asking to go pro se" but instead wanted "substitute counsel." In discussing some of his issues with trial

counsel, the Defendant said that he needed to have an attorney who, "as soon as one of these witnesses tell[s] a lie, they can be right on top of it," and he claimed this was "just not the case with the cross-examinations that [he had] seen with [current trial counsel]." With the exception of the very end of the motion hearing, the Defendant consistently stated that he did not want to proceed pro se because he understood that he needed an attorney to represent him and that he merely wanted "experienced trial counsel" to assist him in this difficult case. It was only after the trial court denied his motion to substitute counsel that the Defendant made his "last-minute" motion to waive counsel so he could assert his right of self-representation. The trial court, in denying this waiver motion, referenced the Defendant's earlier statements that he needed an attorney to represent him in his complex case. Thereafter, the Defendant never informed the trial court that he was no longer concerned about proceeding pro se in this case and that he no longer felt he needed the assistance of an experienced lawyer at trial. While this court acknowledges that a defendant may make a motion to proceed pro se after a motion to substitute counsel is denied, we agree with the State that the Defendant's one-sentence request to proceed pro se, without more, is not enough to unequivocally distance himself from his comments earlier in the hearing. Accordingly, we can easily conclude that the Defendant request for self-representation was not clear and unequivocal.

Moreover, the record clearly shows that the Defendant made his request for self-representation, not because he had a genuine desire to represent himself, but because he wanted to obtain an attorney of his choosing or delay trial. During the Defendant's motion to substitute counsel, the trial court observed that the Defendant was on his twelfth attorney and that the Defendant had made similar complaints about his previous attorneys. The court then warned the Defendant about engaging in conduct that appears to be "an effort to manipulate or delay the trial of the case or to disrupt it[.]" While the trial court did not explicitly find that the Defendant was manipulating the judicial process by filing his motion to substitute counsel, the court warned him about this type of conduct.

After the trial court denied the Defendant's motion to substitute, the Defendant immediately made his last-minute motion to waive counsel. We conclude that the timing of this waiver motion, the trial court's concerns about the Defendant's abusing the judicial process, and the Defendant's repeated claims throughout the motion hearing that he needed counsel but wanted a different attorney to represent him indicates that the Defendant did not have a genuine desire to assert his right to self-representation and was simply using the motion to waive counsel in an attempt to obtain an attorney of his choosing or to delay his trial.

We acknowledge that defendants "are free to seek to invoke a right of self-representation as an alternative should their request for the appointment of a different

- 23 -

attorney be denied." Hester, 324 S.W.3d at 33. However, in this case, the record shows that the Defendant was simply manipulating the judicial process in order to have an attorney of his choosing. Cf. Carruthers, 35 S.W.3d at 546 (noting that the right to counsel "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel"). "Disingenuous invocations of the right of self-representation that are designed to manipulate the judicial process constitute an improper tactic by a defendant and are not entitled to succeed." Hester, 324 S.W.3d at 33 (citing United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982)). We also recognize that "[a] court may deny a manipulative request for self-representation, distinguishing between a genuine desire to invoke a right of self-representation and a manipulative effort to frustrate the judicial process." Id. (citing United States v. Bush, 404 F.3d 263, 271 (4th Cir. 2005); United States v. Frazier-El, 204 F.3d 553, 560 (4th Cir. 2000); Edwards v. Commonwealth, 644 S.E.2d 396, 400 (Va. Ct. App. 2007); People v. Marshall, 931 P.2d 262, 272 (Cal. 1997)). The record in this case clearly shows that the Defendant did not genuinely wish to represent himself and was only making this request to have an attorney of his choosing or to delay his trial, which is reflected in the trial court's findings. See id. at 34. We, like the Hester court, "are wary of creating incentives for defendants to use a request for self-representation as a subterfuge when they lack a genuine desire or intent to represent themselves." Id. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

**II. Admission of Prior Bad Act Evidence.** The Defendant also argues that the trial court abused its discretion in allowing the State to introduce evidence through several witnesses that the Defendant sexually abused BG, the daughter of victim Stanley Goodman, thereby providing a motive for the Defendant to kill the Goodmans. Although the Defendant concedes that the trial court substantially complied with the procedures required under Rule 404(b), he argues that the court "disregarded" the Tennessee Supreme Court's opinion from his first appeal and claims that just as in his first trial, the details of his "alleged sexual abuse" of BG should have been excluded under Rule 403 because "unfair prejudice substantially outweighed any probative effect." See Sexton, 368 S.W.3d at 400-09. The Defendant asserts that on retrial, despite the defense's objection, "the State presented testimony at trial through multiple witnesses that went into great detail of the sexual misconduct of the [D]efendant" and that "[j]ust as in [his] original trial . . . , the recitation of the specific details of the alleged sexual abuse should have been excluded under Rule 403[,] as the amount of unfair prejudice substantially outweighed any probative effect."

In response, the State asserts that the evidence at issue established that the Defendant told BG he would kill her father if she revealed the sexual abuse, that BG later revealed the sexual abuse to her father, that the Defendant discovered BG's revelation, and that less than one week later, BG's father and step-mother were murdered. The State

pursued a theory at trial that the Defendant killed BG's father and step-mother in retaliation after BG told her father that the Defendant sexually abused her. Consequently, the State argues that the evidence of sexual abuse "was highly probative of motive and carried little danger of unfair prejudice." The State also asserts that although establishing the Defendant's motive to commit the killings was not required, it was important evidence because there was little physical or direct evidence presented at trial. The State also contends that while it "had compelling evidence from multiple witnesses" that the Defendant had confessed to these crimes, "the jury might have been skeptical" of this evidence "if there was no explanation as to why [the] Defendant might have killed Stanley and Terri Sue Goodman." Although this is an extremely close issue, we conclude that the trial court did not abuse its discretion in admitting evidence that the Defendant sexually abused BG and then told BG that he would kill her father if she revealed this abuse. Nevertheless, even if the trial court erred in admitting this evidence in the Defendant's retrial, we can easily conclude that this error was harmless in light of the overwhelming evidence of the Defendant's guilt presented at trial, particularly the proof showing that the Defendant confessed to four different individuals that he had killed the Goodmans.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). Rulings on whether evidence is relevant and whether relevant evidence is sufficiently probative to be admissible is reviewed by the appellate court for an abuse of discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

Rule 404(b) prohibits admission of evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character except when it may be relevant to the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. See Tenn. R. Evid. 404(b); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004). Evidence of other crimes, wrongs, or bad acts may be admissible for these purposes if the following conditions are met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

"In Tennessee, the admissibility of other-acts evidence will be decided either on a Rule 401/403 analysis, or a Rule 404(b) analysis, depending on whether the evidence reflects upon the character of the accused." State v. James, 81 S.W.3d 751, 759 (Tenn. 2002). While the balancing test for Rule 403 favors admission because evidence is excluded only when the probative value is substantially outweighed by the danger of unfair prejudice, "Rule 404(b) constitutes a more restrictive admissions test, excluding evidence more frequently than the test in Rule 403." Id. at 758 n.6.

This court reviews a trial court's admission of evidence governed by Rule 404(b) for an abuse of discretion so long as the trial court substantially complies with the above requirements; otherwise, this court's review is de novo. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion "'when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.'" State v. McCaleb, 582 S.W.3d 179, 186 (Tenn. 2019) (quoting Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010)).

In McCaleb, the Tennessee Supreme Court discussed the likelihood that a court's decision will be reversed on appeal under an abuse of discretion standard of review:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the [trial court] . . . or to substitute their discretion for the [trial] court's. The abuse of discretion

- 26 -

standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

Id. (emphasis added) (quoting Lee Med., Inc., 312 S.W.3d at 524); see White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (noting that because "discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen"). "[I]f the reviewing court determines that 'reasonable minds can disagree with the propriety of the decision,' the decision should be affirmed." McCaleb, 582 S.W.3d at 186 (quoting State v. Harbison, 539 S.W.3d 149, 159 (Tenn. 2018)). The McCaleb court then reiterated that:

> [t]o avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

Id. (quoting Lee Med., Inc., 312 S.W.3d at 524).

Prior to trial, the defense filed a motion to exclude testimony of prior sexual assault allegations, investigation, and charges against the Defendant, including any testimony by Hope Tharp. In its response to this motion, the State argued that the Tennessee Supreme Court's opinion from the Defendant's first trial on this issue held that "[t]he sexual abuse was never ruled inadmissible, only the details as relayed by Ms. Tharp and only due to them being cumulative as to motive in light of the admission of other statements during the investigations and regarding the use of sexual abuse as a motive." The State also asked that the defense's motion be denied and that a proper Rule 404(b) hearing be held to determine the admissibility of the specific testimony at issue. Later, the defense filed a motion to exclude statements by the Defendant, and the State filed a response, asserting that the Tennessee Supreme Court's opinion from the Defendant's first trial on this issue held that only the hearsay testimony of Ms. Tharp was inadmissible and only in so far as it was cumulative to the Defendant's own statements to Tharp as well as the testimony offered by other witnesses regarding the Defendant's motive to kill the Goodmans.

At the pre-trial Rule 404(b) hearing, Carrie Trew testified that she was BG's first grade teacher in Bradley County. As a teacher, Trew became concerned because BG was

"very withdrawn" and was a "very, very shy" student who rarely talked to anyone. Trew said that in the spring of 2000 she began worrying about BG after observing several bruises on BG's arms. Trew said that BG eventually made some allegations against the Defendant, which led to DCS coming to the school to investigate .

Hope Tharp, a team leader for DCS, testified that she first received a referral about the Defendant sexually abusing BG in March 2000 from Scott Count. Tharp said this referral was still open on May 16, 2000, when DCS received a second referral from a school in Bradley County about the Defendant's sexually abusing BG on the night of May 15, 2000. When investigating this second referral, Tharp formally interviewed BG, who provided "[e]xtremely specific" details of the Defendant's sexual abuse of her. She noted that although BG, BG's mother, and BG's brother appeared as requested at the DCS office, the Defendant and the Defendant's daughter, BS, did not appear at that time.

Tharp stated that she later interviewed the Defendant, who denied the sexual abuse allegations and claimed they were invented by BG's father, Stanley Goodman, or BG's older sister. The Defendant asserted he had received a phone call from Stanley Goodman in February 2000, wherein Goodman claimed to have a tape of BG describing how the Defendant had sexually abused her, and the Defendant believed that this was why he was being interviewed by DCS. She noted that as a result of her investigation, the three children in the Defendant's home were placed in foster care. Tharp said that after interviewing the Defendant, she made the Defendant an appointment to talk to Detective Alvarez on May 22, 2000. At that point, the State interjected that the indictment in this case charged the Defendant with murdering Stanley Goodman and his wife, Terri Sue, on May 20, 2000. Tharp confirmed that the Defendant never appeared for his interview with Detective Alvarez on May 22, 2000. In response to questioning from the trial court, Tharp said that with the March 2000 referral, BG did not provide a statement that anything happened to her, but with the May 2000 referral, BG described what the Defendant did to her, which resulted in all the children in the Defendant's home being placed in foster care.

BG, who was twenty-eight years old as of the time of this Rule 404(b) hearing, testified that the Defendant was married to her mother, Sherry Farmer, from 1997 to approximately 2001. In 2000, when BG was seven years old, she lived with the Defendant, her mother, her older sister, her older brother, and her step-sister, BS. BG described several instances of physical and sexual abuse by the Defendant that occurred "countless times" on a "weekly" basis. She eventually told her father about the Defendant's abuse of her in the spring of 2000, and her father made a tape of her detailing the Defendant's abuse.

- 28 -

BG also testified about a specific instance, relevant to this appeal, when she was headed downstairs to get a hairbrush and was passed by her step-sister, BS, who was crying. BG said the Defendant told her to come downstairs, which made her "nervous" because she "knew what was going to happen" because it "had happened countless times." When BG got downstairs, the Defendant was angry about BG's telling her teacher about several instances of the Defendant's sexual abuse. BG said she sat on the couch next to the Defendant, and then the Defendant made her "lean over forcefully and perform oral sex on him." BG said that although she tried to resist and was crying, the Defendant made her do it until the Defendant ejaculated into her mouth. Afterward, the Defendant shoved her down and told BG, "Don't tell again or else I'm going to kill your dad." BG recalled going back upstairs crying and then lying down with BS. BG said she and BS each knew the Defendant was sexually abusing the other. The next morning, BG told her teacher, Ms. Trew, what had happened and how the Defendant had threatened to kill her father. BG said that she never saw her father again because the Defendant "murdered [her] dad." She also asserted that she had never recanted her statement that the Defendant sexually abused her. BG acknowledged telling Detective Alvarez during an interview on May 18, 2000, that the Defendant said he would kill her father if she revealed that the Defendant was sexually abusing her. She also said that during her July 17, 2000 interview with the Child Advocacy Center, she told the interviewer Lee Jackson that the Defendant told her that if she told her father about the sexual abuse, "he would kill him." BG also told Jackson during a September 2000 interview that the Defendant told her that she would never see her father again if she told about the sexual abuse because the Defendant would kill him.

BS, the then twenty-nine-year-old step-sister of BG, testified about several instances of physical and sexual abuse by her biological father, the Defendant, when she was a young child, including an incident when the Defendant touched her vagina and forced her to give him oral sex and two incidents when the Defendant penetrated her vagina with his penis. Of particular relevance to this appeal, BS also testified about the last time the Defendant abused her, when the Defendant called her downstairs, penetrated her vagina with his penis, forced BS to give him oral sex until he ejaculated into her mouth and then threatened to kill her if she told anyone. After this incident, BS, who was crying, went upstairs and passed BG, who was going downstairs. When BG went downstairs, BS stayed on the stairs and listened to what was happening below. Although she could not see the Defendant and BG, she heard the Defendant tell BG to "put it in her mouth." When BG said, "No," BS heard the Defendant slap BG, which caused BG to cry, and then she heard the Defendant threaten her. BS said that BG was crying when she went back upstairs. BS also testified about overhearing an argument between the Defendant and Sherry Farmer, wherein the Defendant admitted he molested his kids, and Farmer immediately denied it.

At the conclusion of this hearing, the trial court found that the allegations of the Defendant's ongoing sexual abuse of BG, which would constitute the crime of rape of a child, a Class A felony, were relevant to issue of motive, stating:

The [c]ourt concurs in the contention that motive is an issue and that this testimony is relevant to the issue of motive. The evidence explains why the [D]efendant would commit these murders. In short, if [Stanley Goodman] were to testify as [the Defendant] allegedly believed he might, [the Defendant] would be in prison for a great part of his life. The evidence also explains why [the Defendant] allegedly told [Preston] Adams that he shot the victim to dispose of incriminating evidence. The evidence of the motive also refutes the alibi defense raised by the [D]efendant. The evidence also explains the circumstantial evidence offered by the State.

After summarizing the testimony provided by Carrie Trew, Hope Tharp, BG, and BS, the court found that the evidence of the Defendant's sexual abuse of BG, including the offense of rape of a child, was established by clear and convincing evidence. Lastly, in weighing the probative value of this evidence against the danger of unfair prejudice, the court recognized that because the case involved little direct evidence, motive would be "a crucial issue in the case." Accordingly, the trial court held that the evidence of the Defendant's sexual abuse of BG was "necessary to establish motive" to commit the murders in this case and that "the danger of unfair prejudice d[id] not outweigh the probative value of the evidence."

In response to the Defendant's argument that this evidence was inadmissible under Rule 403, the trial court found that for the reasons it had previously given that "the probative value [wa]s not substantially outweighed by the danger of unfair prejudice." Ultimately, the trial court granted the State's motion and denied the Defendant's motion, concluding "in short" that "the allegations of sexual misconduct on the part of the [D]efendant as it relates to [BG] will be admissible at trial." The trial court then entered an order stating that a material issue existed other than conduct conforming with a character trait; the evidence of the Defendant's commission of rape of a child against BG was clear and convincing; and the probative value of the evidence of BG's sexual abuse outweighed the danger of unfair prejudice. The trial court also held that the testimony of BS was limited to that portion that corroborated the sexual abuse of BG by the Defendant and that the Defendant's statements made in connection with the investigation of sexual abuse against BG were admissible.

At the motion for new trial hearing, the trial court considered the Defendant's claim that it erred in allowing substantive evidence of the Defendant's alleged sexual

abuse of BG to be presented to the jury through the testimony of multiple witness. Specifically, the court held:

> [T]estimony that the [D]efendant sexually penetrated then-seven-year-old [BG] constitutes the offense of rape of a child. The [D]efendant would be in prison for a great part of his life if convicted [of the rape of a child offense]. Stanley Goodman, one of the homicide victims, was the father of [BG]. Stanley Goodman may have testified regarding the [Defendant's] sexual abuse [of BG]. His testimony could have assisted in the prosecution of the [D]efendant. The impending investigation and potential subsequent prosecution may be considered as a motive for murder. Motive is a crucial issue in the case. There's little direct evidence, so the danger of unfair prejudice is outweighed by the probative value. Evidence of the [D]efendant's motive refutes the alibi defense and bolsters the circumstantial evidence presented by the State.

After reiterating that it made the required findings under Rule 404(b), the trial court ultimately denied relief on this claim, holding that based upon the evidence presented at the January 2022 trial, the "[aforementioned] reasons still exist and are a proper basis for allowing this testimony of the prior conduct of [the Defendant] for the purpose of establishing motive in killing Mr. and Mrs. Goodman."

Despite the Defendant's claims about the applicability of Rule 403, we conclude that the trial court correctly applied Rule 404(b) to determine the admissibility of the Defendant's "other acts" evidence because this evidence "reflects upon the character of the accused." James, 81 S.W.3d at 759. We also note the record shows, and the Defendant concedes, that the trial court substantially complied with the requirements of Rule 404(b) before admitting evidence regarding the allegations that the Defendant had sexually abused BG. Consequently, we review the court's ruling under the abuse of discretion standard.

Based on his appellate brief, the Defendant's main challenge seems to be the trial court's weighing of probative value against the unfair prejudice. Therefore, we must consider whether the trial court properly admitted proof of the sexual abuse allegations under the balancing test of Rule 404(b)(3). Id.

The State's theory at trial was that the Defendant killed BG's father and step-mother on May 20, 2000, in retaliation for BG's revealing that the Defendant sexually abused her on May 15, 2000. Accordingly, evidence of the May 15 incident of sexual abuse was essential in establishing the Defendant's motive to commit the killings of BG's

father and step-mother and in establishing the Defendant's identity as the perpetrator in this case.

First, the Defendant asserts that just as in his first trial, the motive for the murders was adequately established through testimony of several witnesses that the Defendant was under investigation for sexual abusing his children. He argues that because he was willing to stipulate that he was being investigated for sexually abusing his children, the testimony from several witnesses about the details of the alleged sexual abuse was "cumulative at best" and served the purpose of "plac[ing] before the jury the criminal propensity of the Defendant."

With regard to this point, we note that "it is well settled that the prosecution is free to reject the offer of a defendant to stipulate certain facts." Id. at 761 (citing State v. Smith, 644 S.W.2d 700, 701 (Tenn. Crim. App. 1982) (concluding that "the State should not be forced into a stipulation, designed to keep relevant but damaging evidence from coming before the jury, when the evidence is not unfairly prejudicial"); State v. Griffis, 964 S.W.2d 577, 595 (Tenn. Crim. App. 1997) (reiterating that "[a] stipulation requires the acquiescence of all parties to the litigation")). However, it is also clear that "an accused cannot marshal the evidence of the State by simply offering to stipulate to a fact for the purpose of barring the State from introducing admissible, demonstrative evidence the accused does not want the jury to see." Griffis, 964 S.W.2d at 595. Consequently, an offer to stipulate evidence "does not render that evidence irrelevant under Rule 404(b)(2)." James, 81 S.W.3d at 761. Here, we conclude that the State was not required to accept the Defendant's stipulation that he was being investigated for sexual abusing his children. We also conclude that the State's evidence, which consisted of direct testimony from BG (and corroborating direct testimony from BS) that the Defendant sexually abused BG on May 15, 2000, and that the Defendant threatened to kill her father if she revealed this abuse just five days before her father and step-mother were killed, provided particularly strong evidence of the Defendant's motive and his identity as the perpetrator of the killings. See id.

Second, the Defendant argues that on retrial, the trial court "disregarded" the Tennessee Supreme Court opinion from his direct appeal of his original trial, allowing the State to present proof from multiple witnesses who provided great detail regarding the Defendant's sexual abuse of BG. Referencing the State's argument that the direct testimony on retrial from BG and BS regarding the May 15, 2000 incident of sexual abuse was distinguishable from the hearsay testimony offered by Hope Tharp in his first trial, the Defendant argues that "substantive evidence of the alleged prior sexual misconduct was presented to the jury in complete disregard of the previous ruling of our Supreme Court." See Sexton, 368 S.W.3d at 400-09.

In Sexton, the Tennessee Supreme Court granted the Defendant's appeal after the Court of Criminal Appeals affirmed the judgments from his first trial. Id. at 378. As one of the issues raised, the Tennessee Supreme Court considered the Defendant's claim that the trial court failed to comply with Rule 404(b) regarding whether to allow Hope Tharp to testify concerning the details of BG's allegations that the Defendant sexually abused her. Id. at 400. The court recognized that the trial court had not substantially complied with Rule 404(b), and therefore the trial court's ruling was not entitled to deference because it failed to receive the proposed testimony from Tharp at the hearing and failed to state on the record whether the prior act was proven by clear and convincing evidence. Id. at 404. The court, recognizing that BG did not testify at the Rule 404(b) hearing, held that "[b]ecause of the inherent unreliability of Ms. Tharp's hearsay recollections of B.G.'s allegations, the proof does not meet the clear and convincing standard and, as a result, should have been excluded under Rule 404(b)." Id. at 405. After noting the extremely inflammatory nature of sex-related bad acts involving child victims, the court held that the unfair prejudicial effect of the alleged sex abuse outweighed the probative value of this evidence as to motive:

> Because the statements of the Defendant to Ms. Tharp, and the testimony of Officer Millsaps, Detective Alvarez, Adams, Mason, and Ms. Swallows during the course of the trial—as outlined in the factual summary— established the Defendant's motive to kill, the hearsay testimony offered by Ms. Tharp, while compelling in its detail, was cumulative on the issue of motive. For that reason, the probative value of Ms. Tharp's hearsay testimony as to the Defendant's guilt of the murders of the Goodmans was not essential to the State's case. Thus, contrary to the requirements for admission under Rule 404(b), the unfair prejudicial effect of the alleged sex abuse outweighed the probative value as to motive.

Id. at 406-07. The court's only reference to Rule 403 was in addressing the Defendant's claim that Tharp's hearsay testimony regarding the sexual abuse allegations made by BG violated his right of confrontation. With regard to this specific issue, the Tennessee Supreme Court held:

> In summary, because the motive for the [murders of Stanley and Terri Sue Goodman were] clearly established through other of the State's witnesses, the probative value of B.G.'s allegations, as related by Ms. Tharp, insofar as it established motive, was cumulative. In consequence, the inflammatory nature of the allegations of sexual misconduct was such that Ms. Tharp's recitation of their details should have also been excluded under a Rule 403 analysis.

Id. at 409.

We agree with the State that the Rule 404(b) evidence was presented very differently at the Defendant's second trial. Initially, we note that on retrial the trial court substantially complied with the Rule 404(b) requirements, which means that we must review the trial court's ruling for an abuse of discretion, rather than the de novo review used in the Defendant's first appeal. On retrial, the prior bad act evidence, both at the Rule 404(b) hearing and at trial, consisted of the direct testimony of BG and BS, rather than just the hearsay testimony of DCS employee Hope Tharp. In addition, on retrial, BG's testimony about the Defendant's May 15, 2000 sexual abuse of her was then corroborated by BS's testimony as well as Tharp's and Trew's testimony. Consequently, the proof of the prior bad act on retrial was established by clear and convincing evidence, as supported by the detailed findings of the trial court. By presenting the direct testimony of BG (and BS) as to the specific incident of sexual abuse, as opposed to just hearsay testimony from Tharp, the State presented substantially more credible and more probative evidence on the issue of the Defendant's motive to kill BG's father and step-mother. Finally, because the allegations of sexual abuse had significantly greater probative value on retrial, the probative value of this evidence was not outweighed by the danger of unfair prejudice. See State v. Moss, 13 S.W.3d 374, 382-84 (Tenn. 1999) (concluding that the trial court did not abuse its discretion in admitting prior bad act evidence showing the defendant's motive and intent to shoot his wife in order to collect insurance proceeds and to regain access to his minor daughter where the trial court substantially complied with the requirements of Rule 404(b), the defendant's minor daughter testified at the Rule 404(b) hearing and trial about incidents of inappropriate sexual conduct by the defendant, the daughter's testimony was corroborated by the defendant's journal, and the trial court provided a limiting instruction at the time this evidence was presented and in its general charge).

We agree with the State that evidence regarding the Defendant's motive for committing the killings in this case was particularly significant, especially given that there was no physical evidence connecting the Defendant to the offenses. While the State presented testimony from several witnesses to whom the Defendant had confessed to these crimes, we agree that the jury might have been suspicious of such testimony if the State had not provided a reasonable explanation for why the Defendant killed the victims in this case. The evidence of the Defendant's sexual abuse of BG and his threat to kill her father just five days prior to the killings established with particularity not only the Defendant's motive to commit the killings but also the Defendant's identity as the perpetrator. Accordingly, it had extremely high probative value.

We also conclude that this evidence, under the particular circumstances here, had a relatively low danger of unfair prejudice. While proof regarding sexual abuse of child

victims is always inflammatory to some degree, the trial court took several steps at trial to lessen the inflammatory effect of this evidence. In particular, the trial court only allowed BG to testify to the one incident of sexual abuse by the Defendant that occurred on May 15, 2000, rather than the Defendant's repeated sexual abuse of her. In addition, the trial court limited BS's testimony to what she observed about the Defendant's sexual abuse of BG on May 15, 2000, even though BS could have testified that the Defendant had been continually sexually abusing BS and BG over a lengthy period of time. Lastly, the trial court specifically instructed the jury that while it could not consider the evidence of sexual abuse to prove the Defendant's "disposition to commit such as crime as that on trial," it could consider this evidence "if it tend[ed] to show a motive of the [D]efendant for the commission of the offense[s] presently charged." The trial court also repeated this instruction to the jury during its jury charge. An appellate court must presume that the jury followed the instructions given by the trial court. Berry, 141 S.W.3d at 584 (citing State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000)). Given all these factors, we agree with the State that "[o]n balance, the probative value of the evidence outweighed its danger of unfair prejudice, or, at the very least, reasonable minds could disagree on the issue, meaning that the trial court acted within its discretion."

Here, the trial court determined, after complying with the Rule 404(b) requirements, that the evidence of the Defendant's sexual abuse of BG on May 15, 2000, as well as his threat that he would kill her father if she revealed this sexual abuse was admissible to prove the Defendant's motive to kill the Goodmans, that this evidence was established by clear and convincing evidence, and that the probative value of this evidence was not outweighed by the danger of unfair prejudice. While the trial court's ruling on this issue is not the only ruling that we would have considered within the bounds of its sound discretion, we conclude that the trial court's ruling was a reasonable choice among several acceptable alternatives. See McCaleb, 582 S.W.3d at 186. Here, the trial court properly identified and applied the most appropriate legal standard to this issue, reached a logical and reasonable decision, and based its decision on a correct assessment of the evidence. Id. (citing Lee Med., Inc., 312 S.W.3d at 524). For all these reasons, we conclude that the trial court's decision to admit this Rule 404(b) evidence was within the limits of the trial court's sound discretion. See id. at 198.

Lastly, we note that even if the trial court erred in admitting this Rule 404(b) evidence, this error was harmless. A violation of an evidentiary rule, such as Rule 404(b), does not require reversal if the error "'was more probably than not harmless.'" State v. Martin, 964 S.W.2d 564, 568 (Tenn. 1998) (quoting United States v. Barrett, 703 F.2d 1076, 1081-82 (9th Cir. 1983)). "Harmless error analysis applies to virtually all evidentiary errors other than judicial bias and denial of counsel." James, 81 S.W.3d at 763 (citing Wilson v. State, 724 S.W.2d 766, 769 (Tenn. Crim. App. 1986)). Moreover, a judgment of conviction "shall not be set aside unless, considering the whole record, error

involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Therefore, when considering the effect of such an error on the trial, this court "will evaluate that error in light of all of the other proof introduced at trial." James, 81 S.W.3d at 763 (citing Gilliland, 22 S.W.3d at 274).

We note that four individuals—Sherry Farmer, Christy Swallows, Preston Adams, and Danny Mason—all testified that the Defendant confessed to them that he had killed the Goodmans. Farmer and Adams also said the Defendant admitted that he had worn a sweat suit to the Goodmans' home, which he burned, and that he had disposed of the rifle he used in the killings. Farmer confirmed that when the Defendant picked up her from work on May 20, 2000, she noticed a bag containing a black sweat suit inside the car that had not been there that morning. A receipt from Dollar General for the purchase of a sweatshirt and sweatpants on May 20, 2000, was later found in the Defendant's car. Lieutenant Alvarez testified that the Defendant told him that BG's allegations of sexual abuse were "cooked up by the Goodmans." When Lieutenant Alvarez informed the Defendant that the Goodmans were coming to Bradley County on May 22, 2000, to petition for custody of the children, he heard the Defendant announce that "if he was going to jail," it would not be "for sexual abuse or molestation" but "for murder." Deputy Millsaps also overheard the Defendant tell his wife, "If I go to jail for anything, it'll be for murder." Danny Mason testified that the Defendant, the day before the murders, obtained a firearm of the same caliber used to kill the Goodmans. EG testified that the Defendant knew that she went to the races with her aunt every Saturday night, including May 20, 2000, and that Stanley Goodman always left the front door to the house unlocked for her.

In light of the overwhelming evidence of the Defendant's guilt, we conclude that the admission of BG's sexual abuse allegations, even if error, did not "more probably than not affected the judgment" or "result in prejudice to the judicial process." Tenn. R. App. P. 36(b); see State v. Clark, 452 S.W.3d 268, 288 (Tenn. 2014). We can comfortably conclude that even if admission of this Rule 404(b) evidence was error, it constituted harmless error in light of the other evidence of the Defendant's guilt presented at trial. Accordingly, we affirm the trial court's judgments in this case.

## CONCLUSION

We hold that the trial court did not commit constitutional error in denying the Defendant's request for self-representation. In addition, we hold that the trial court did not abuse its discretion in admitting the Rule 404(b) evidence and that even if the trial court erred in admitting this evidence, this error was harmless in light of the

overwhelming evidence of the Defendant's guilt.  Therefore, the judgments in this case are affirmed.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE